IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | |
| v. | Criminal No. 21-320 (ADC/BJM) |
| **CARLOS MANUEL COTTO-CRUZ**, | |
| Defendant. | |

### REPORT AND RECOMMENDATION

On May 7, 2021, Puerto Rico Police Bureau ("PRPB") agents arrested Carlos Manuel Cotto-Cruz ("Cotto-Cruz") pursuant to a Puerto Rico arrest warrant. They executed the warrant at a residence in Orocovis, Puerto Rico. During the arrest, PRPB agents searched the residence, photographed it, and seized evidence. PRPB agents had not previously sought a search warrant. On September 8, 2021, the federal grand jury returned an indictment against Cotto-Cruz. Docket No. ("Dkt.") 1. He was indicted for possession with intent to distribute under the following statutes: 21 U.S.C. § 841(a)(1), (b)(1)(A) for cocaine, cocaine base (crack), and fentanyl; 21 U.S.C. § 841(a)(1), (b)(1)(B) for heroin; and 21 U.S.C. § 841(a)(1), (b)(1)(D) for marihuana. *Id.* Further, he was indicted for possession of a firearm and a machine gun in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A) and 18 U.S.C. § 924(c)(1)(B)(ii) respectively. *Id.* Cotto-Cruz moved to suppress photographs of the residence where he was arrested, evidence seized from that structure, and any subsequent statements he made to police. Dkt. 39. The government opposed, Dkt. 45, Cotto-Cruz replied, Dkt. 54, and the government surreplied. Dkt. 58. This matter was referred to me for a report and recommendation. Dkt. 41. I held a suppression hearing on May 25, June 6, and June 9, 2023. Dkt. 106, 115, 119.

For the reasons that follow, I recommend the motion to suppress be **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

The following account of the facts is drawn from the testimonial and documentary evidence received at the hearing. The government presented the following witnesses: Daniel Casiano-Rivera ("Casiano-Rivera"), Yarimar Aviles-Colón, PRPB Sergeant Jose Fernando Navarro-Perez ("Sergeant Navarro-Perez"), PRPB Agent Freddy Ruiz-Bonnet ("Agent Ruiz-Bonnet"), PRPB Agent Freddy Muriel-Cintrón ("Agent Muriel-Cintrón"), and PRPB Sergeant Marie Tere Rivera-Rivera ("Sergeant Rivera-Rivera"). Cotto-Cruz testified on his own behalf.

### *The Rental Arrangement*

After he was indicted on state charges, Cotto-Cruz hired Sonia Aviles-Colón as an escort and asked her to find an Airbnb where he could reside. *Cotto Cruz Test.* May 25, 2023. She sought help from her sister, Yarimar Aviles-Colón, who found a residential property located at kilometer 32.9 on road 155 in Barrio Gato, Orocovis, Puerto Rico ("the Orocovis residence"). *Aviles-Colón Test.* May 25, 2023. On February 24, 2021, Yarimar rented this residence for one month. *Id.* Though she did not intend to stay at the property, she rented it in her name as a favor to Sonia. *Id.* Yarimar believed Sonia would use the Orocovis residence for her work as an escort because she had previously helped her sister rent properties for this purpose several times. *Id.*

Casiano-Rivera owns the Orocovis residence. Dkt. 116 at 5:20–6:1. He visited it on the first day of the rental agreement and turned over possession of the property to a young woman. *Id.* at 8:6–19. The woman, Sonia Aviles-Colón, checked the property while her companion, Cotto-Cruz, remained in the vehicle in which the pair had arrived. *Aviles-Colón Test.* May 25, 2023; *Cotto-Cruz Test.* May 25, 2023. Sonia then gave Cotto-Cruz the keys to the residence because he planned to stay there continuously while she would visit her own home and family. *Id.*

Soon after he gave Sonia the keys, Casiano-Rivera received a message through Airbnb that a piece of glass had broken on top of the bathroom sink in the property. Dkt. 116 at 8:20–24. He visited four to five days later to fix the issue. *Id.* at 8:25–9:8. While he was there, Cotto Cruz confronted him asking why he was in the home. *Id.* at 10:10–16; *Cotto-Cruz Test.* May 25, 2023. During this visit, Casiano-Rivera saw no activity on the property that would have led him to ask renters to leave. Dkt. 116 at 112:12–20.

At the end of the one-month rental, Cotto-Cruz contacted Casiano-Rivera to extend his stay on the property. *Cotto-Cruz Test.* May 25, 2023. Cotto-Cruz did not identify himself during this call and requested that Yarimar continue to be the contracting party. *Id.* Casiano-Rivera then prepared a six-month lease contract, which Yarimar signed. *See* ex. 1; *Aviles-Colón Test.* May 25, 2023. Yarimar never interacted with Cotto-Cruz and only explicitly authorized her sister to stay on the property. *Id.* However, she understood that her sister's clients would stay there with her. *Id.* Cotto Cruz continued living at the property until his May 7th, 2021 arrest and his children regularly visited him during his stay. *Cotto-Cruz Test.* May 25, 2023 and June 9, 2023.

### *The Investigation of Cotto-Cruz*

Sometime before the arrest, an informant told PRPB Agents Ruiz-Bonnet and Muriel-Cintrón, who were tasked with executing the arrest, that Cotto-Cruz was staying at the Orocovis residence. *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintron Test.* June 6, 2023. On May 6, 2021, they visited the area seeking to corroborate this tip by interviewing neighbors. *Id.* During these interviews, Agent Ruiz-Bonnet noticed a drone buzzing overhead and believed Cotto-Cruz could have been using it to observe his activities. *Ruiz-Bonnet Test.* May 25, 2023. Later, Agent Muriel-Cintrón called Casiano-Rivera, the residence's owner, who told him Cotto-Cruz lived at the property. *Muriel-Cintron Test.* June 6, 2023. Casiano-Rivera was never asked about a phone call

with police during his testimony and never mentioned telling them Cotto-Cruz was staying at the Orocovis residence. I note that Casiano-Rivera visited the property to fix broken glass sometime in late February and was confronted by a man inside the residence during this visit. Dkt. 116 at 10:10–21. However, Casiano-Rivera never learned this man's name during their brief interaction and only observed that he was wearing a mask and cap and had a beard. *Id.* at 10:17–11:13. Cotto-Cruz testified he stayed in a car while Sonia picked up the keys from Casiano-Rivera and, as mentioned, never introduced himself to the owner of the Orocovis residence when he called to extend the rental. *Cotto-Cruz Test.* May 25, 2023. However, he interacted with Casiano-Rivera's sister during his stay. *Id.*

During their surveillance, both agents also noted two vehicles associated with Cotto-Cruz parked on the property, a BMW sports car and a Ford F-150 pick-up truck. *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintron Test.* June 6, 2023. Though they never personally saw Cotto-Cruz use these vehicles, they saw pictures of him driving them and neighbors also confirmed he had done so. *Id.* Though Agent Ruiz-Bonnet witnessed the BMW being driven early that morning, he could not identify the driver. *Ruiz-Bonnet Test.* May 25, 2023.

After finishing the surveillance, Agent Ruiz-Bonnet developed an arrest plan. *Ruiz-Bonnet Test.* May 25, 2023. He enlisted a SWAT unit to breach the residence and an intelligence unit in case any evidence was found during the arrest. *Id.* Agent Muriel-Cintrón testified that the arrest order for Cotto-Cruz could not be amended to include a search warrant because he was a flight risk and a dangerous individual. *Muriel-Cintron Test.* June 6, 2023. Thus, the agents decided to execute the arrest order early the next morning. *Id.*

### The Entry and Arrest

Agents Ruiz-Bonnet and Muriel-Cintrón returned to the Orocovis residence on May 7, 2021 with SWAT team members, an intelligence unit, and other police assets. *Muriel-Cintron Test.* June 6, 2023. Police established a perimeter around the property, and Sergeant Navarro-Perez and his SWAT unit approached the residence. *Navarro-Perez Test.* May 25, 2023. An unidentified member of the SWAT Unit yelled "Police! Police!" to announce the officers' presence. *Navarro-Perez Test.* May 25, 2023; *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintron Test.* June 6, 2023. Hearing no response, the SWAT team tried to force open the door. *Id.* Meanwhile, another unidentified SWAT officer yelled "¡estan floshando!" which Agents Ruiz-Bonnet and Muriel-Cintrón assumed meant that drugs were being flushed down a toilet in the residence. *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintron Test.* June 6, 2023.

Cotto-Cruz disputed these claims. He testified he had been in the main bedroom of the property watching television when he heard police announce themselves outside. *Cotto-Cruz Test.* June 6, 2023. He left the room and entered the residence's hallway where he heard shrieking from heavy machinery being used to pry open the side door of the residence. *Id.* He said he tried to tell police outside he would open the door, but he was unable to find the keys before they forced their way in and threw a flashbang grenade. *Id.*

Upon entering the residence's living room, SWAT officers saw a man in the hallway approaching them with his hands in the air. *Navarro-Perez Test.* May 25, 2023. Sgt. Navarro-Perez detained him after a short struggle, confirmed he was Cotto-Cruz based on the photos he had previously seen, and moved him into the living room so officers could continue searching the residence for other suspects. *Id.* Agent Ruiz-Bonnet, who had been standing by the breached doorway with Agent Muriel-Cintrón, then confirmed Cotto-Cruz's identity by calling him his

nickname, "Waza," to which Cotto-Cruz responded by lifting his head and nodding affirmatively. *Ruiz-Bonnet Test.* May 25, 2023. Within five to ten minutes of his arrest, agents brought Cotto-Cruz to the front of a neighbor's house. *Cotto-Cruz Test.* June 6, 2023. He did not learn anything from police about his arrest until he reached the station later in the day. *Id.*

### The Post-Arrest Sweep and Evidence Seizure

Sgt. Navarro-Perez then searched other rooms in the house for possible suspects, beginning with the bathroom. *Navarro-Perez Test.* May 25, 2023. There, he noticed what appeared to be illicit substances wrapped in vacuum-sealed packaging placed above a blue cooler along with a knife and drug paraphernalia. *Id.*; *see* ex. 10. One plastic-covered block of apparently illicit substances also lay half-opened on the ground next to the sink. Ex. 12. Sgt. Navarro-Perez found powdered residue on the sink countertop and white crystalline rocks at the bottom of the toilet bowl. Ex. 13. A white trash bag was also visible peeking out of the toilet cistern. Exs. 14, 19, 21. Sgt. Navarro-Perez sealed the bathroom to avoid contaminating the scene before continuing to the bedroom on its right. *Navarro-Perez Test.* May 25, 2023. There, he found a woman identified later as Sonia Aviles-Colón whom he also took into custody. *Id.* He then checked the remaining rooms and found no other people. *Id.* After the sweep, the SWAT team left the residence and informed the supervising officer that two individuals were detained in the living room. *Id.*

Agents Ruiz-Bonnet and Muriel-Cintrón took custody of both individuals arrested during the operation and kept them close to the living room. *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintron Test.* June 6, 2023. Both agents testified that they noticed some uncovered green plastic pails containing a vacuum-sealed substance they believed to be cannabis located close to the entryway area. *Id.*; *see also* exs. 24, 25. In the area next to the dining room table, laying on the floor against the wall, Agents could see a baking tray containing a pink powder they believed to

be heroin along with other drug packaging paraphernalia. Exs. 26, 27. On the floor next to the living room wall furthest from the residence entrance, both agents could also see a money counting machine, a strainer, and three partially obstructed plastic bowls. Exs. 38, 39, 40. Atop the cardboard box covering the bowls lay another small bag containing a white powder which agents assumed was cocaine. Ex. 46. Agent Ruiz-Bonnet then walked through the residence to ensure no more SWAT officers remained inside. *Ruiz-Bonnet Test.* May 25, 2023. After that, he returned to Agent Muriel-Cintrón who had remained close to the residence entrance with the detainees. *Id.* Both agents then turned the scene over to Sgt. Marie T. Rivera who was tasked with seizing evidence. *Ruiz-Bonnet Test.* May 25, 2021.

Sgt. Rivera-Rivera entered the residence with a K-9 unit approximately one hour after the arrest. *Rivera-Rivera Test.* June 6, 2023. She performed a visual check of the living room spotting the marijuana pails close to the entrance and proceeded towards the back rooms of the residence. *Id.* There, she saw a storage area with wooden shelves next to the bedroom where she found a bullet and some Ziploc bags. *Id.*; *see also* exs. 54 and 56. In the bathroom, she saw the same scene as Sgt. Navarro-Perez and Agent Ruiz-Bonnet. *Rivera-Rivera Test.* June 6, 2023. She also removed the top off the toilet cistern and opened the bag which revealed bundles of United States currency inside. *Id. See* exs. 19 and 21.

In the bedroom where Sonia Aviles-Colón was found, Sgt. Rivera-Rivera saw a bed raised against the wall, several open suitcases, and bags containing vacuum-sealed blocks of illicit substances spilling out in front of the doorway. *See* exs. 57, 58, 64. The luggage behind the vacuum-sealed bricks also contained bags of what appeared to be marijuana. *See* exs. 72. To the right of the entranceway, she saw a black handbag containing rifle and pistol magazines, exs. 69, 70, 71, and a small red duffel bag filled with packaged illicit substances and what she identified as

drug paraphernalia used to cut and prepare them. *See* exs. 82, 83, 84. There was another black bag next to the vacuum-sealed bricks containing what she identified as drug paraphernalia and lactose, a common ingredient used to cut substances. *Rivera-Rivera Test.* June 6, 2023; *See* exs 88, 89. At the back of the room she found an uncovered white pot containing a plastic bag full of white powder. *See* exs. 90 and 91.

In the master bedroom, she encountered a mess of clothing by the doorway which contained an orange envelope filled with bags of pink pills and small baggies. *Rivera-Rivera Test.* June 6, 2023; *See* ex. 111. When she approached the dresser, she noticed the butt of a pistol in a half-open drawer. *See* ex. 100. She then pulled the drawer further open, retrieved the pistol, removed its magazine, and placed it with other magazines she found on the bed. *Rivera-Rivera Test.* June 6, 2023; *see also* exs. 102, 105, 109. At the foot of the dresser, she found a black and gray plastic box with a $20 bill sticking out from its side. Ex. 113. She then opened it and discovered it was full of bound stacks of United States currency. Ex. 114. She also saw an uncovered closet with wooden shelves containing boxes of ammunition partially covered by a Johnnie Walker Black Label box. *See* exs. 119, 121. After picking up the Johnnie Walker box and hearing objects rattling inside, Sgt. Rivera-Rivera opened it and found loose ammunition. *Rivera-Rivera Test.* June 6, 2023; *See* ex. 122.

In the dining and living room area, Sgt. Rivera-Rivera saw a black bucket, opened it, and found pre-packaged substances inside. *See* ex. 28, 29, 30. Beside the bucket, she saw a brown paper bag with a clear bag of white powder inside. *See* exs. 31, 32. Between a vacuum sealer and a black baking pan containing a pink powder, Sgt. Rivera-Rivera found two Ziploc bags containing folded pieces of aluminum prepared with substances inside. *See* exs. 33, 34, 35.

Sgt. Rivera-Rivera then saw three mixing bowls. One was red, another was light blue, and the last one was dark blue. *See* exs. 38, 39. A box with a small Ziploc bag filled with white powder covered the light and dark blue bowls, but she could still see a spoon sticking out of the red bowl as well as its contents. *See* ex. 38. She could only see the contents of the light and dark blue bowls once the box obstructing them was removed. *See* ex. 40. She identified the materials in the three bowls as illicit substances in different stages of refinement. *Rivera-Rivera Test.* June 9, 2023; *see* exs. 40–43.

Moving to the kitchen, Sgt. Rivera-Rivera examined an assortment of items on and around the counter. She saw a small weight scale, small Ziploc bags, a bag of rubber bands, and rolling papers. *See* exs. 48, 49. She also noted two closed small notebooks lying above a "phillies blunt" box, which she opened and read. *See* exs. 48, 50–52. She also spotted an orange pail on the floor filled several unfilled baggies which she believed were used for drug packaging. *See* ex. 47. She could not recall if the lid was on the orange pail when she arrived but did not see anyone remove it. *Rivera-Rivera Test.* June 9, 2023.

Cotto Cruz took issue with much of the agents' testimony regarding evidence found in the residence. He testified that all the illicit substances, weapons, ammunition, money, and drug paraphernalia had originally been packed into closed suitcases and bags lying on top of the beds in the bedroom near the front of the house to the left. *Cotto-Cruz Test.* June 9, 2023. He also alleged that all dresser drawers in the main bedroom had been closed before police entered. *Id.*

Casiano-Rivera returned to the property multiple times following the arrest. *Casiano-Rivera Test.* May 25, 2023. After a woman he believed was Cotto-Cruz's wife removed items from the residence, he began cleaning the premises. *Id.* During this process, he found a dark green rifle behind one of the beds that was propped up from the floor by its attached magazine. *See* ex. 3. He

also found plastic bags and a bank card. *See* ex. 2. He immediately contacted the FBI which sent an agent to pick up the items. *Casiano-Rivera Test.* May 25, 2023.

## DISCUSSION

Cotto-Cruz challenges the admission of the photos taken at and evidence seized from the Orocovis residence. He argues he had a reasonable expectation of privacy, the agents lacked a sufficient basis to enter the residence, and the evidence seized was not found in plain view during a permissible search incident to lawful arrest or protective sweep of the premises. Dkt. 39. The government disagrees on all points. Dkt. 45. I address each contention below.

### I.        Reasonable Expectation of Privacy

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88 (1988) (quoting *Rakas v. Illinois*, 439 U.S. 128, 144 (1978)) (internal quotation omitted). Thus, to challenge a search or seizure a defendant must demonstrate "an actual, subjective, expectation of privacy . . . that society is prepared to recognize as objectively reasonable." *United States v. Battle*, 637 F.3d 44, 48–49 (1st Cir. 2011) (internal quotations omitted); *see United States v. Rodriguez-Ramos*, 704 F.2d 17, 21 (1st Cir. 1983) (defendant "bears the burden of showing that he had an expectation of privacy in the travel bag and thus standing to challenge the legality of its search").

The government argues Cotto-Cruz lacks standing to challenge the search of the residence where he was arrested and the evidence seized during that search because he lacked a reasonable expectation of privacy in the premises. Dkt. 45 at 8–10. First, it says Cotto-Cruz did not establish

a subjective expectation of privacy because he did not submit an affidavit or statement asserting he had a legitimate expectation of privacy over the property searched and seized. Dkt. 45 at 9–10. Further, it argues he lacked an objectively reasonable expectation of privacy because he was a fugitive using false names, did not assert the residence was his home, had another person unaware of his identity rent the residence, and used the residence to conduct criminal activity. Dkt. 45 at 10. I disagree and recommend finding Cotto-Cruz had a reasonable expectation of privacy.

I start with Cotto-Cruz's subjective expectation of privacy. Though he submitted an affidavit, Dkt. 39-1, the government argues it failed to assert he had a legitimate expectation of privacy in the property searched and seized. Dkt. 45 at 9 (citing *United States v. Lewis*, 40 F.3d 1325, 1333 (1st Cir. 1994)). It argues Cotto-Cruz's affidavit states the house where he was arrested was rented, but does not state he or the woman with whom he lived were the tenants. Dkt. 58 at 2. The *Lewis* court found the affidavit at issue there was prepared by the defendant's attorney who had no first-hand knowledge of the event and contained only conclusory allegations that police lacked probable cause or a reasonable articulable suspicion of criminal activity when arresting the defendants there. 40 F.3d at 1333. Unlike the defendants in *Lewis*, Cotto-Cruz's personally swore out an affidavit. *See id.* at 1332; Dkt. 39-1. In it, he stated the property searched was the home where he resided for months before his arrest. *Id.* His uncontroverted testimony at the suppression hearing supported his contention that he lived at the residence searched. "[T]he Fourth Amendment is at its zenith with respect to an individual's home." *United States v. Delgado-Perez*, 867 F.3d 244, 251 (1st Cir. 2017) (further citations omitted). Cotto-Cruz further testified the drugs, drug paraphernalia, and weapons seized belonged to him. *Cotto-Cruz Test.* June 9, 2023. The government does not contest this. Thus Cotto-Cruz's affidavit, based on his own personal knowledge, went well beyond the conclusory assertions found insufficient in *Lewis*. Accordingly,

I recommend finding Cotto-Cruz established a subjective expectation of privacy in the property searched and seized.

Next, I turn to the government's argument Cotto-Cruz lacked an objectively reasonable expectation of privacy because he was a fugitive using false names, did not assert the residence was his home, had another person unaware of his identity rent the residence, and used the residence to conduct criminal activity. Dkt. 45 at 10. Cotto-Cruz conceded that he was a fugitive, asked a hired escort to rent the residence on his behalf, was not a party to the lease agreement, and stored drugs and drug paraphernalia at the residence. *Cotto-Cruz Test.* May 25, 2023 and June 9, 2023. I nevertheless recommend finding that he had an objectively reasonable expectation of privacy in the Orocovis residence.

I start with Cotto-Cruz's status as a fugitive. At the end of the suppression hearing, the government directed my attention to *U.S v. Randolph*, 210 F. Supp. 2d 586 (E.D. Penn. 2002). It noted that court found an escapee from a halfway house lacked a reasonable expectation of privacy where he was staying because he had no such expectation at the halfway house. The *Randolph* court stated it was a matter of first impression whether a convicted fugitive had Fourth Amendment standing. 210 F. Supp. 2d at 589. It then looked to the Supreme Court's decision in *United States v. Knights*, 534 U.S. 112 (2001) holding that probationers enjoyed fewer rights than those who had not been convicted of a crime. *Randolph*, 210 F. Supp. at 589–90. The *Knights* court observed that the underlying assumption of the probation system was that a probationer "is more likely than an ordinary citizen to violate the law." 534 U.S. at 120 (quotations and citations omitted). And it found probationers more incentivized to quickly dispose of evidence given their awareness that there is no right to a jury trial nor requirement that the government prove its case beyond a reasonable doubt in proceedings for probation violations. *Id.* Thus, it found, the Fourth

Amendment balance applies differently to probationers and convicted fugitives than to those who enjoy the presumption of innocence. *Id.* at 121.

Like all criminal defendants, Cotto-Cruz enjoys the presumption of innocence. *See, e.g.*, *Estelle v. Williams*, 425 U.S. 501, 503 (1976) ("The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice."). Accordingly, *Randolph* and *Knights* are distinguishable from this case. Both cases differentiate between citizens who have never been sentenced for a crime, finding they enjoy a reasonable expectation of privacy, and convicted criminals who, either because they are serving probation or assigned to live in a halfway house, lack such an expectation. Cotto-Cruz is undisputedly the former. Moreover, the Court has previously held a defendant wanted in connection with a murder had a reasonable expectation of privacy in the house where he was hiding because he was an overnight guest. *Minnesota v. Olson*, 495 U.S. 91, 93–94, 100 (1990). Accordingly, Cotto-Cruz's status as an indicted fugitive did not undermine his reasonable expectation of privacy.

The government next argues Cotto-Cruz lacked a reasonable expectation of privacy in the Orocovis residence because he did not assert the residence as his home. Dkt. 45 at 10. As mentioned, "status as an overnight guest is alone enough to show that [a person] had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Olson*, 495 U.S. at 96-97. Accordingly, Cotto-Cruz need not have treated the residence as his home to assert a reasonable expectation of privacy. However, I note that "property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property." *Carter*, 525 U.S. at 90 (1998). The *Carter* court addressed whether two defendants had a reasonable expectation of privacy in an apartment they visited once for approximately two-and-a-half hours to package

cocaine and paid the lessee by giving him some of their supply. *Id.* at 86. The Court found the purely commercial nature of the transaction, the defendants relatively short time on the premises, and the lack of any previous connection between the defendants and the householder warranted finding no reasonable expectation of privacy. *Id.* at 91.

Here, Cotto-Cruz is, at a minimum, an overnight guest. He testified he lived in the Orocovis residence for several months before his arrest. *Cotto-Cruz Test.* May 25, 2023. Yarimar Aviles-Colón, the renter of the property, testified she rented it for her sister to use in her work as an escort. *Aviles-Colón Test.* May 25, 2023. Though she did not know the identities of her sister's clients, including Cotto-Cruz, Aviles-Colón knew her sister would bring clients to the property and never told her she could not do so. *Id.* While there was undoubtedly a commercial element to Cotto-Cruz's stay in Orocovis, it was not purely commercial in nature. He testified that he often stayed alone at the property while Sonia Aviles-Colón returned to her family. *Cotto-Cruz Test.* May 25, 2023. He stated his children would visit the residence and police found items lending credence to that assertion. *Cotto-Cruz Test.* June 9, 2023; *see, e.g.*, ex. 28. Thus, Cotto-Cruz's stay in the Orocovis residence cannot be said to be *purely* commercial in nature.

Moreover, unlike the defendants in *Carter* who spent a few hours in an apartment, evidence suggests Cotto-Cruz lived at the Orocovis residence for at least two months. The owner of the residence, Casiano-Rivera, testified he turned over the keys to an Airbnb guest in late February. Dkt. 116 at 8:11–19. Yarimar Aviles-Colón, who rented the Airbnb, testified that her sister, Sonia, retrieved the keys from Casiano-Rivera. *Aviles-Colón Test.* May 25, 2023. And Cotto-Cruz testified that he accompanied Sonia Aviles-Colón when she retrieved the keys and then moved into the residence. *Cotto-Cruz Test.* May 25, 2023. Though Cotto-Cruz established no connection with either Sonia or Yarimar Aviles-Colón prior to arranging his stay in Orocovis, he lived in the

home for several months before his arrest there on May 7, 2023. And his "status as an overnight guest endowed him with Katz's protection of a reasonable expectation of privacy in the [residence]." *United States v. Bain*, 874 F.3d 1, 13 (1st Cir. 2017).

The government also argues Cotto-Cruz lacked a reasonable expectation of privacy because he sought to hide his presence at the Orocovis residence by asking Sonia, who in turn asked Yarimar, to rent the property. Dkt. 45 at 9–10. The government contends Cotto-Cruz's decision to have someone else sign the rental agreement and provide a false name and occupation to the owner of the Orocovis residence strips him of his reasonable expectation of privacy. *Id.* However, the mere overnight guest at issue in *Olson* is, by definition, not listed on the lease. As for Cotto-Cruz's efforts to conceal his identity from the owner of the residence, the government cites no authority that a leaseholder or her overnight guests must properly identify the latter to the property owner to preserve their Fourth Amendment protections. *Olson* notes people stay in one another's homes while traveling, visiting family, moving, or housesitting. 495 U.S. at 98. The *Olson* court never stated that renters must properly identify such people to their landlords for them to receive Fourth Amendment protections. Nothing suggests that the defendant there, who was on the run from police, was so identified. *Id.* at 93–94. Instead, *Olson* is grounded in the "everyday expectations of privacy that we all share." *Id.* at 98. The government's argument would require tenants to provide their landlords with the names and occupations of family, friends, casual sexual partners, and any other overnight guests to preserve their Constitutional right to be free from warrantless entry into their home. Such a requirement does not comport with the logic of *Olson*. Accordingly, Cotto-Cruz's failure to correctly identify himself to the owner of the Orocovis residence does not deprive him of a reasonable expectation of privacy there.

The government lastly argues that Cotto-Cruz lacked a reasonable expectation of privacy in the Orocovis residence because he used it for criminal purposes. Dkt. 45 at 10. However, "[a] criminal may assert a violation of the Fourth Amendment just as well as a saint." *United States v. Washington*, 573 F.3d 279, 284 (6th Cir. 2009); *see also United States v. Pitts*, 322 F.3d 449, 458 (7th Cir. 2003) ("[T]he legitimate expectation of privacy does not depend on the nature of the defendant's activities, whether innocent or criminal."); *United States v. Vega*, 221 F.3d 789, 797 (5th Cir. 2000), *abrogated on other grounds, as recognized in United States v. Aguirre*, 664 F.3d 606, 611 n. 13 (5th Cir. 2011) ("Nor did [Defendant] forfeit his fourth amendment protection by using the premises for illegal activities."); *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997) ("Privacy expectations do not hinge on the nature of defendant's activities—innocent or criminal."). Accordingly, Cotto-Cruz's alleged use of the Orocovis residence for criminal activities did not deprive him of his reasonable expectation of privacy.

For the reasons discussed, I recommend finding Cotto-Cruz held a reasonable expectation of privacy in the Orocovis residence.

## II.     Basis for Entry

Cotto-Cruz next argues that PRPB agents lacked the requisite knowledge to enter his residence. Dkt. 39 at 3–6. An arrest warrant authorizes the police to enter a suspect's residence "when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). Even if it becomes known after entry that the residence is not the suspect's, the entry is justified if the police had "reasonably believed" that (1) the suspect resided at the location and (2) the suspect would be present. *United States v. Graham*, 553 F.3d 6, 12 (1st Cir. 2009); *see also United States v. Werra*, 638 F.3d 326, 337 (1st Cir. 2011)."[A]bsent exigency or consent, an officer

may not search a third-party's residence on the basis of an arrest warrant without having a search warrant for the premises." *Solis–Alarcon v. United States*, 662 F.3d 577, 580 (1st Cir. 2011).

Cotto-Cruz argues police must show they had probable cause to believe he resided at and was inside the residence, while the government argues they merely need a reasonable belief. *Compare* Dkt. 54 at 6–7 *with* Dkt. 58 at 2–3. The First Circuit has never directly answered the question, though it has assumed without deciding that reasonable belief is a lower standard, *United States v. Hamilton*, 819 F.3d 503, 506 n.5 (1st Cir. 2016), and has implicitly accepted this premise while describing it as the majority view. *Werra*, 638 F.3d at 337. I need not enter this debate because I recommend finding that police had probable cause to believe Cotto-Cruz resided at and was inside the Orocovis residence.

Cotto-Cruz contends neither prong of the *Payton* inquiry is satisfied. As to the first prong, he notes the arrest warrant and information listed in Puerto Rico's DAVID system lists an address in Caguas, not Orocovis, as his residence. Dkt. 39 at 5. He further argues the government only stated a "source of information" led it to believe he was living at the Orocovis residence. Dkt. 39 at 5. He points to no caselaw stating that officers may only search for suspects at the address listed on the warrant or in an official database. As discussed below, relevant authority points away from such a finding. Further, one of the government's witnesses at the suppression hearing identified at least one of its sources of information as the owner of the residence.

"Certain facts" such as a suspect's "credit card applications, utility bill, car registration, and mail" being sent to a house "will almost always give rise to a reasonable belief that the subject of an arrest warrant resides at the place entered." *Graham*, 553 F.3d at 13. However, such "rock solid indicators" are not necessarily required to find a reasonable belief that a suspect lived at a particular residence. *United States v. Young*, 835 F.3d 13, 21 (1st Cir. 2016). The First Circuit has

found officers had an objectively reasonable belief a suspect lived in a hotel room after the hotel manager told them the suspect had rented the room for three weeks and a man detained in the parking lot told officers the suspect was then inside the suite. *United States v. Jones*, 523 F.3d 31, 37 (1st Cir. 2008). Other courts have held officers may consider neighbors' statements that a suspect lives in a particular residence. *See United States v. Boyd*, 180 F.3d 967, 978 (8th Cir. 1999); *United States v. Lovelock*, 170 F.3d 339, 344–45 (2d Cir. 1999).

Though officers here lacked "rock solid indicators" that Cotto-Cruz resided in the Orocovis residence, they had at least as much information as the officers in *Jones*. Agent Ruiz-Bonnet saw the black Ford F-150 pickup truck with the license plate 867-267 that he recognized from his investigation of Cotto-Cruz parked outside the Orocovis residence on the morning of the arrest. *Ruiz-Bonnet Test.* May 25, 2023; *see also*, exs. 4, 5. An unidentified person told Agent Ruiz-Bonnet he or she previously saw Cotto-Cruz driving that pickup truck and Agent Ruiz-Bonnet saw pictures of Cotto-Cruz doing so on Wednesday May 5, two days before the arrest. *Ruiz-Bonnet Test.* May 25, 2023. Agent Ruiz-Bonnet interviewed multiple people to confirm Cotto-Cruz lived in the residence. *Id*. A person he interviewed told him that Cotto-Cruz was inside the residence, though he did not memorialize this conversation. *Id*. Agent Muriel-Cintrón likewise saw the black Ford F-150 during his investigation and confirmed seeing the same vehicle at the residence on the day before and on the morning of Cotto-Cruz's arrest. *Muriel-Cintron Test.* June 6, 2023; *see also*, ex. 5. Further, he said he spoke with the owner of the Orocovis residence, Casiano-Rivera, who confirmed Cotto-Cruz was living there. *Muriel-Cintrón Test.* June 6, 2023. I note that Cotto-Cruz asserts he never introduced himself to Casiano Rivera. *Cotto-Cruz Test.* May 25, 2023. However, even assuming Casiano-Rivera never confirmed Cotto-Cruz lived in the Orocovis residence, PRPB

agents still had probable cause to believe he did because they recognized vehicles associated with him parked outside and neighbors confirmed that he lived there. *See Jones*, 523 F.3d at 37.

Still, the officers must also establish that they had a sufficient basis to believe Cotto-Cruz was present at the Orocovis residence on the morning of his arrest. "[A]ctual viewing of the suspect on the premises is not required." *Werra*, 638 F.3d at 339 (quoting *Valdez v. McPheters*, 172 F.3d 1220, 1226 (10th Cir. 1999)). Nevertheless, "the officers must point to at least some evidence suggesting that the individual named in the arrest warrant is present." *Id.* That evidence might be the presence of a car associated with a suspect and the knowledge of their employment circumstances making it likely the suspect would be home and asleep. *Id.* (further citations omitted). Officers may also consider that a person involved in criminal activity may be attempting to conceal his whereabouts. *Valdez*, 172 F.3d at 1226 (citing *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995)). They may further note the running of electrical devices and the time of day. *Id.* (citing *United States v. Route*, 104 F.3d 59, 63 (5th Cir. 1997)) (further citations omitted). Ultimately, they must consider common sense factors and the totality of the circumstances. *Id.* (citing *United States v. Pruitt*, 458 F.3d 477, 483 (6th Cir. 2006)).

Here, none of the officers saw Cotto-Cruz at the residence before his arrest, However, two of them recognized vehicles associated with Cotto-Cruz, the BMW and the black Ford F-150, parked at the Orocovis residence on the day of the arrest. *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintrón Test.* June 6, 2023. The day before the arrest, agents interviewed neighbors who recognized Cotto-Cruz. *Ruiz-Bonnet Test.* May 25, 2023. While they conducted those interviews, a drone began buzzing overhead, which they feared was being used to monitor them. *Ruiz-Bonnet Test.* May 25, 2023. As discussed, Agent Muriel-Cintrón said he interviewed the owner of the Orocovis residence who confirmed that Cotto-Cruz was there, *Muriel-Cintrón Test.* June 6, 2023.

However, this identification is not necessary to find probable cause. Officers also knew Cotto-Cruz was the target of a high-profile investigation, *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintrón Test.* June 6, 2023, and could reasonably assume that such a person would not be leaving their home for work in the morning. An officer saw movement through the window moments before police entered the residence. *Navarro-Perez Test.* May 25, 2023. While the agents surrounded the house, one yelled "están floshando" which was understood to mean that people were flushing evidence down the toilet. *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintrón Test.* June 6, 2023. Based on interviews in which neighbors identified Cotto-Cruz as being at the Orocovis residence, observation of vehicles associated with Cotto-Cruz at the residence, knowledge that Cotto-Cruz was a fugitive, their observation of movement in the residence, and the sound of a flushing toilet coming from the residence, officers had probable cause to believe Cotto-Cruz was inside before they entered.

### III.   Seizure of Evidence

After arresting a suspect in a residence, officers may constitutionally conduct two types of warrantless protective searches. First, they may look in "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334 (1990). They need "no probable cause or reasonable suspicion" to do so. *United States v. Archibald*, 589 F.3d 289, 295 (6th Cir. 2009). Second, officers may perform a "limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 337. To evaluate whether such a belief existed, courts use the *Terry v. Ohio* standard asking, "would the facts available to the officer at the moment of the . . . search warrant a man of reasonable caution

in the belief that the action taken was appropriate?" *Delgado-Perez*, 867 F.3d at 252 (quoting *Buie*, 494 U.S. at 21–22) (quotation marks omitted). "[A] protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Buie*, 494 U.S. at 335. It should "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36.

During either type of search authorized under *Buie*, officers may seize items found in plain view if they have probable cause to believe the item is evidence of a crime. *Id.* at 330. Police may seize an object in plain view if they are lawfully able to view the evidence and the evidentiary value of the item is "immediately apparent." *Coolidge v. New Hampshire*, 403 U.S. 443 (1971). Three elements determine whether the plain view exception applies: (1) the police must show that they "did not violate the Fourth Amendment in arriving at the [p]lace from which the evidence could be plainly viewed," *Horton v. California*, 496 U.S. 128, 139–40 (1990); *Thompson v. Louisiana*, 469 U.S. 17, 22 (1984); (2) the seizing officer must have a lawful right of access to the evidence, *see Horton*, 496 U.S. at 136–37; and (3) the incriminating nature of the evidence seized must be immediately apparent. *Id.* "Immediately apparent" means that police have probable cause to believe an object in plain view is contraband. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

### A. Immediately Adjoining Area

Officers testified they arrested Cotto-Cruz in the living room at the front of the Orocovis residence, which has an adjoining kitchen separated by a bar. *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintrón Test.* June 6, 2023; *Rivera-Rivera Test.* June 9, 2023. Cotto-Cruz does not dispute this. Dkt. 39 at 9; Cotto-Cruz *Test.* June 9, 2023. Accordingly, officers could search anywhere

from which an attack could be launched in this area and its adjoining spaces without establishing probable cause or reasonable suspicion. *Buie*, 494 U.S. at 334; *Archibald*, 589 F.3d at 295.

### B. Protective Sweep

Cotto-Cruz argues that, at most, the officers' sweep should have ended there, especially after a woman came out of a bedroom and was placed under arrest. Dkt. 39 at 9. The government argues Cotto-Cruz was a fugitive wanted for murder and officers could thus reasonably believe that he, the woman, or other occupants of the house posed a danger warranting a sweep. Dkt. 45 at 12. It also argues agents could perform a protective sweep under the exigent circumstances doctrine because they heard the toilet flushing when they approached the residence. Dkt. 58 at 4–5.

### 1. Officer Safety

"Underlying a protective sweep is the 'risk of danger in the context of an arrest in the home' due primarily to the reality that there may be 'unseen third parties in the house.'" *United States v. Winston*, 444 F.3d 115, 119 (1st Cir. 2006) (quoting *United States v. Lawlor*, 406 F.3d 37, 41 (1st Cir.2005)) (further quotations and citations omitted). Accordingly, "[i]n order for a warrantless search to be a protective sweep, 'there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *See United States v. Serrano-Acevedo*, 892 F.3d 454, 459 (1st Cir. 2018) (citing *Buie*, 494 U.S. at 334).

Before officers arrested Cotto-Cruz on the morning of May 7, they knew the following information: Cotto-Cruz was a fugitive wanted in connection with a murder, agents had intermittently surveilled the Orocovis residence since 12:30 a.m. the day before, neighbors recognized Cotto-Cruz after agents showed them photos, the owner of the residence told agents

Cotto-Cruz lived there, on the morning of the arrest two vehicles associated with Cotto-Cruz were parked outside the residence, and agents saw movement through the windows and heard the toilet flushing while approaching the house. When agents announced their presence, no one answered the door. When they entered, they threw a flashbang device, began searching what Agent Navarro-Perez described as areas of danger, found Cotto-Cruz, and arrested him. *Navarro-Perez Test.* May 25, 2023. When asked to clarify what he meant by "areas of danger" Agent Navarro-Perez testified that in an unknown structure every area is an area of danger. *Navarro-Perez Test.* May 25, 2023. After finding Cotto-Cruz, Agent Navarro-Perez then continued to the bathroom where he saw white powder, but no people. *Navarro-Perez Test.* May 25, 2023. He then went to a room to the right of the bathroom where he said agents found and arrested a woman, later identified as Sonia Aviles-Colón. *Navarro-Perez Test.* May 25, 2023. Agent Navarro-Perez then went to the remaining rooms, looked inside, and said "clear" to indicate that no one was inside. *Navarro-Perez Test.* May 25, 2023; *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintrón Test.* May 25, 2023.

Agents arrested Cotto-Cruz in the living room and brought him to Agent Ruiz-Bonnet who was standing in the doorway of the residence, which opens into that room. *Ruiz-Bonnet Test.* May 25, 2023. Agent Ruiz-Bonnet saw plastic pails in the living room that appeared to have marijuana inside them and a baking tray with white powder that he understood to be a controlled substance. *Ruiz-Bonnet Test.* May 25, 2023. He testified he did not go anywhere else in the residence until Cotto-Cruz was in custody and, when he did, he only entered to make sure everything was in order and ensure no members of the SWAT team remained in the residence. *Ruiz-Bonnet Test.* May 25, 2023. After Cotto-Cruz was arrested, Agent Muriel-Cintrón stayed with him in the entryway of the residence. *Muriel-Cintrón Test.* May 25, 2023. While there, he smelled marijuana and acetone and spotted money on the floor. *Muriel-Cintrón Test.* May 25, 2023.

The government first argues police could search other rooms of the Orocovis residence to ensure officer safety because agents arrested Cotto-Cruz inside that structure. Dkt. 45 at 15. Agent Navarro-Perez likewise testified that every area in an arrestee's residence is an "area of danger." *Navarro-Perez Test.* May 25, 2023. *Buie* does not support either contention. As discussed, agents must have a reasonable belief based on specific and articulable facts that other individuals who may pose a danger are present beyond the immediate arrest area if they wish to search that area. *Buie*, 494 U.S. at 337. A finding that all areas of a residence where an arrestee is found are areas of danger subject to a protective sweep would erase the distinction in *Buie* between areas immediately adjacent to the arrest scene for which no reasonable suspicion is required to search and the remainder of the residence for which such suspicion is a prerequisite to search. *See* WAYNE R. LAFAVE ET AL. 3 SEARCH & SEIZURE § 6.4(c) (6th ed. 2020) ("It would seem that a smaller sweep is contemplated under the bright-line half of *Buie*, for it would make no sense to have two rules (one requiring reasonable suspicion, the other requiring nothing but the fact of arrest) for exactly the same conduct."). To search a residence, officers must have an articulable reason to suspect that some person other than the one arrested could be present in the residence and pose a danger to officers. *See Delgado-Perez*, 867 F.3d at 252–253 (suppressing evidence after noting pre-arrest intel work did not indicate another dangerous person would be found in the home, there was no evidence of violence at or near the home, no evidence the arrestee was armed and dangerous, and no evidence that multiple persons were present at the residence). Further the contention that protective sweeps are standard practice in Puerto Rico does not mean such sweeps are permitted by the Constitution. *Serrano-Acevedo*, 892 F.3d at 460.

I note that *Delgado-Pérez* and *Serrano-Acevedo* both involved arrests that occurred immediately outside of a residence, while agents here arrested Cotto-Cruz inside the Orocovis

residence. *See* 867 F.3d at 247; 892 F.3d at 458. Nevertheless, that does not change the logic of *Buie*, which requires reasonable suspicion of dangerous persons elsewhere to search a residence beyond the immediate arrest area. *Delgado-Pérez*, 867 F.3d at 251–52 (citing *Buie*, 494 U.S. at 334). The First Circuit has consistently required knowledge of facts providing agents with an articulable reason to suspect that some person other than the one arrested could be present in the residence and pose a danger to officers. *Id.* at 252 (discussing cases). Accordingly, the mere fact that agents arrested Cotto-Cruz inside the Orocovis residence does not automatically warrant conducting a protective sweep of the entirety of that structure.

The government next notes Cotto-Cruz was wanted in connection with a double murder and the agents thus had a good-faith reason to believe he was armed and dangerous. Dkt. 45 at 15. While the First Circuit left open the possibility that an arrestee's potential for violence warranted a protective sweep in *Delgado-Pérez*, it has since foreclosed such a justification. *See Serrano-Acevedo*, 892 F.3d at 459 (because arrestee had been detained, government's justification for protective sweep depended on "articulable facts" supporting a reasonable inference that, at the time of the sweep, there was an *additional* suspect in the house who was armed).

The facts of *Serrano-Acevedo* bear some notable similarities to this case. After the bank robbery charged there, police detained one suspect and traced the other's phone to a house in a rural residential area in Puerto Rico. *Serrano-Acevedo*, 892 F.3d at 457–58. When they arrived at the house approximately eight hours after the robbery, the SWAT team knocked on the door, heard the toilet flushing and heard people talking inside. *Id.* at 458. They then opened the door and told the people to come outside, while they remained outside. *Id.* The suspect's wife appeared and was detained and the suspect subsequently appeared and was immediately arrested. *Id.* After these arrests, the SWAT team entered the home and swept the premises during which they saw money

on a bed and in a toilet. *Id.* Though an FBI agent testified this search was justified by the hot pursuit exception, the government abandoned that theory on appeal and argued it was a lawful protective sweep. *Id.* at 458–59. Assuming the government even could raise this new theory on appeal, the First Circuit found no articulable facts warranting such a sweep because there was no reason to believe an additional suspect was in the residence. *Id.* at 459.

Here, likewise, while Cotto-Cruz was wanted in connection with a serious and violent crime, he posed no danger to the agents warranting a protective sweep once he was detained. Further, though agents found Sonia Aviles-Colón, the government presented no "articulable facts" that agents' reasonably believed anyone dangerous remained inside the residence after Cotto-Cruz's arrest. It never argued, for example, that Cotto-Cruz committed violent crimes with a co-conspirator who was not yet in custody. *See id.* And the unstated assumption that others might be involved in Cotto-Cruz's alleged crimes is unfounded speculation not grounded in "articulable facts" in the record. *Id.* at 460 (citing *Delgado-Pérez*, 867 F.3d at 251). Finally, while the government argues agents saw weapons in the living room where Cotto-Cruz was arrested, Dkt. 45 at 16, neither the government's photos of the room, nor the agents' testimony supports this assertion. Accordingly, *Serrano-Acevedo* supports finding that agents lacked the articulable facts needed to justify their sweep.

Though the government argues Sonia Aviles-Colón's presence in the Orocovis residence warranted agents' reasonable suspicion that others may also be present, two individuals were present in *Serrano-Acevedo* but the First Circuit nevertheless found no reason to believe a third would be found. *Id.* at 459. Further, while the bank robbery in *Serrano-Acevedo* occurred eight hours before agents conducted their arrest, *id.*, agents here knew Cotto-Cruz was on the run for months. Thus, even if agents here stated they believed Cotto-Cruz committed his crimes with other

violent individuals, which they did not, there was no articulable basis to believe those individuals would be present in his hideout several months later. *See United States v. Ford*, 56 F.3d 265 (D.C. Cir. 1995) (insufficient that "appellant had accomplices with him when he committed the crime" because crime "occurred almost seven months prior"). Moreover, Sergeant Navarro-Perez testified agents began their protective sweep *before* discovering Sonia Aviles-Colón. *Navarro-Perez Test.* May 25, 2023. Thus, their discovery of her during the sweep cannot justify their prior decision to commence the sweep. *See Delgado-Pérez*, 867 F.3d at 252 (explaining courts consider "the facts available at the moment of the . . . search."). Accordingly, none of the government's proffered justifications for a protective sweep are supported by relevant authority.

I note two other pieces of evidence. First, agents observed two cars parked outside the residence. *Navarro-Perez Test.* May 25, 2023; *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintrón Test.* June 6, 2023. However, Agent Ruiz-Bonnet testified he had only seen pictures of Cotto-Cruz driving them. *Ruiz-Bonnet Test.* May 25, 2023. Second, agents saw pails of marijuana and money in the living room where they arrested Cotto-Cruz. *Navarro-Perez Test.* May 25, 2023; *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintrón Test.* June 6, 2023. However, when the government argued a protective sweep was justified because the arrestee was charged with drug trafficking, the First Circuit found the sweep unlawful. *Delgado-Perez*, 867 F.3d at 254, 256 In doing so, it explicitly rejected the idea that "because the person arrested is sought for drug trafficking, it is reasonable to suspect for that reason alone that there may be another person in the home who poses a danger to officer safety." *Id.* at 254. Presumably then, merely because officers find some evidence of drug trafficking in a residence, specifically two pails of marijuana and an unspecified amount of cash, that alone does not give rise to a reasonable suspicion that there may be another person in the home who poses a danger to officer safety.

*United States of America v. Carlos Manuel Cotto-Cruz*, Criminal No. 21-320 (ADC/BJM)                    28

Like *Delgado-Perez* and *Serrano-Acevedo*, the facts established here fall short of what the First Circuit requires to authorize a protective sweep. *United States v. Hernandez-Mieses*, 931 F.3d 134 (1st Cir. 2019) is illustrative. The court there noted officers had the following information:

> they had arrived at the house at 5:45 AM and found multiple people up and about; when they approached the front door, they saw the shadows of several people through frosted glass; when they announced themselves, a person inside locked the door; when they entered, they saw three people, but observed four cellphones on the table; they observed a gun; finally, they saw a staircase close to the counter where the gun was found and an open door leading from the kitchen to the pool area and garage.

*Id.* at 143. None of the agents here testified to observing multiple people, no one locked the door when they arrived (although it appeared to have already been locked), they saw one person (Cotto-Cruz) upon entry, and they saw no cellphones or weapons. Instead, they heard a toilet flushing, forced their way in through a locked door, and saw Cotto-Cruz in the hallway with his hands in the air. *Navarro-Perez Test.* May 25, 2023. Near where they arrested him, they saw two pails of marijuana, exs. 22–25, a tray of what appeared to be controlled substances, exs. 26–27, a vacuum sealer, ex. 28, a brown bag of white powder, exs. 29, 31, pieces of aluminum packaging, exs. 33–34, a cash counting machine, ex. 38, and a bowl containing white rocks they believed to be controlled substances. Exs. 38, 41. While certainly contraband, none of this evidence suggests the presence of additional people in the residence.

No other testimony supported the government's contention that officers reasonably believed the residence harbored a dangerous individual. Agent Ruiz-Bonnet stated he only moved beyond the immediate arrest area to make sure everything was in order and ensure no members of the SWAT team remained inside. *Ruiz-Bonnet Test.* May 25, 2023. I note that an officer's *subjective* belief or intention is *irrelevant* to Fourth Amendment analysis. *United States v. Guerrero*, 19 F.4th 547, 559 (1st Cir. 2021) (quoting *Lawlor*, 406 F.3d at 43 n.8) (emphasis in original) (further citations omitted). More important is that Agent Ruiz-Bonnet conducted his

sweep after agents from the SWAT team already viewed the premises and gave the "clear" signal. *Ruiz-Bonnet Test.* May 25, 2023. Thus, he could not reasonably believe persons posing a risk to officers remained in the areas he swept. *See United States v. Paradis*, 351 F.3d 21, 29 (1st Cir. 2003) (suppressing gun found on subsequent sweep of apartment after finding no reason to think another person besides the arrestee was in the apartment because officers had already swept it). Further, Agent Muriel-Cintrón did not view the premises beyond the living room where Cotto-Cruz was arrested. And though PRPB Sergeant Rivera-Rivera saw the entire premises, she did not have any reason to believe dangerous persons remained within it because she did not enter the residence until SWAT agents told her it was under control. *Rivera-Rivera Test.* June 6, 2023. Because Agent Ruiz-Bonnet and Sergeant Rivera-Rivera did not view the property until other agents had stated it was "clear," they had no reasonable belief dangerous people remained inside.

In reaching my conclusion, I note "the experienced perceptions of law enforcement agents deserve deference and constitute a factor in [the First Circuit's] reasonable suspicion analysis." *Winston*, 444 F.3d at 119 (citation omitted). Yet, as in all other circumstances, Supreme Court and First Circuit caselaw are nevertheless binding authority. Both demand a showing that officers harbored a reasonable suspicion that someone posing a danger to them remained inside the residence, something this record does not support. Accordingly, I recommend finding the officers' safety justified searching only those areas immediately adjoining the site of Cotto-Cruz's arrest: the living room, the kitchen, and the entryway of the Orocovis residence.

### 2. Preservation of Evidence

The government also argues exigent circumstances justified the agents' entry into and sweep of the Orocovis residence because agents needed to prevent the destruction of evidence. Dkt. 58 at 4–5. Specifically, it argues agents heard a toilet flushing when they approached the

structure. Dkt. 45 at 21. "[A] warrantless entry into a person's dwelling may be permitted if exigent circumstances arise," *United States v. Samboy*, 433 F.3d 154, 158 (1st Cir. 2005) (internal quotations omitted). And to find exigent circumstances, "the police must reasonably believe that 'there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.'" *Id.* (quoting *Fletcher v. Town of Clinton*, 196 F.3d 41, 49 (1st Cir. 1999)).

Police had a warrant to arrest Cotto-Cruz, which, as discussed above, authorized them to enter the residence after they established that they "reasonably believed" he resided at the location and was present. *Graham*, 553 F.3d at 12; *see also Werra*, 638 F.3d at 337. Thus, they need not establish an exigent circumstance existed to authorize their entry into the residence. Nevertheless, I note "the need 'to prevent the imminent destruction of evidence' has long been recognized as a sufficient justification for a warrantless search." *Kentucky v. King*, 563 U.S. 452, 460 (2011). And "[w]here, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed." *Id.* at 462. The *King* Court explicitly noted that "[d]estruction of evidence issues probably occur most frequently in drug cases because drugs may be easily destroyed by flushing them down a toilet." *Id.* at 461. Thus, police had an additional basis to enter the Orocovis residence because the sound of flushing created an exigency.

More consequential is the government's argument that exigent circumstances justified searching the Orocovis residence. Dkt. 45 at 20; Dkt. 58 at 4–5. Cotto-Cruz responds that, because the government found several kilograms of controlled substances, it cannot reasonably argue he could have flushed all these substances before his arrest. Dkt. 54 at 11. Further, he argues there was no risk he would destroy the drugs once he was arrested. *Id.* Thus, he claims there was no exigency. *Id.*

The exigent circumstances inquiry examines the totality of the circumstances. *United States v. Owens*, 917 F.3d 26, 35 (1st Cir. 2019) (citing *Missouri v. McNeely*, 569 U.S. 141, 149 (2013)). Courts must consider "the gravity of the underlying offense; whether delay poses a threat to police or the public safety; [and] whether there is a great likelihood that evidence will be destroyed if there is a delay until a warrant can be obtained." *United States v. Veillette*, 778 F.2d 899, 902 (1st Cir. 1985) (further citations omitted).

PRPB agents arrested Cotto-Cruz in connection with "a crime of the most serious nature, a potential double-homicide." *See Owens*, 917 F.3d at 35. However, as discussed above, Cotto-Cruz did not pose a threat to police or public safety after he was arrested. *Serrano-Acevedo*, 892 F.3d at 459. Still, before entering the home, police heard a toilet flushing and, upon entry, they discovered controlled substances which the Supreme Court has noted are easily destroyed by flushing down a toilet. *King*, 563 U.S. at 461. Because police reasonably believed their entry into the Orocovis residence interrupted the ongoing destruction of evidence in the bathroom, there was a "great likelihood" this destruction could continue if police did not neutralize that possibility.

When police fear imminent destruction, removal, or concealment of evidence in a dwelling, "the least restrictive intrusion is to be adopted." *United States v. Palumbo*, 742 F.2d 656, 659 (1st Cir. 1984).

> When it is known that no one is presently on the premises, they may be secured merely by guarding the entrances. When persons are present and such persons may reasonably be feared to pose a substantial threat to destroy evidence, more intrusive action may be proper. Even then, the police might be well advised to give the occupants a choice of exiting the premises. This might be accompanied by "a very quick and limited pass through the premises to check for third persons who may destroy evidence."

*Id.* (citations omitted). Here, police heard flushing before they entered the residence. They arrested Cotto-Cruz and saw drug paraphernalia in plain view immediately adjacent to the arrest site. The situation here falls between the two scenarios contemplated by *Palumbo*. Agents here neither knew

that no one was on the premises nor, as discussed, that others were on the premises. However, *Palumbo* contemplates a very quick and limited pass through the premises to check for third persons. *Id.* That is exactly what Agent Navarro-Perez did here. Given the evidence that drugs were being destroyed before agents entered and that drugs remained after Cotto-Cruz's arrest, I recommend finding Agent Navarro-Perez's quick and limited pass through the premises to check for third persons was proper.

I note Cotto-Cruz's arguments that he could not have destroyed all the substances found before his arrest and that he could not have destroyed any of them once he was arrested. As to his first argument, Cotto-Cruz cites no authority that the exigent circumstances inquiry requires the government to establish that agents feared all, as opposed to some, evidence may be destroyed. At least one court has considered the similar argument that exigent circumstances do not arise until officers fear a "substantial portion of the evidence was being lost." *United States v. Rivera*, 248 F.3d 677 (7th Cir. 2001). Dismissing this as an "unworkable standard," the *Rivera* court noted courts determine whether exigent circumstances exist by analyzing the perspective of officers at the scene and that it is virtually impossible for them to make this kind of proportionality analysis. *Id.* The same logic applies here. Agents posted outside the Orocovis residence had no way of knowing whether people inside could completely dispose of their controlled substances or not. And even once they saw controlled substances in the living room, they could not know how much, if any, remained in other rooms of the house. Further, "even the destruction or removal of a relatively small amount of evidence can have significant consequences at sentencing, where the drug quantity impacts the sentence." *Rivera*, 248 F.3d at 681. Accordingly, Cotto-Cruz's argument fails to the extent that he argues exigent circumstances did not arise because he could not have liquidated his entire controlled substance inventory.

As for Cotto-Cruz's second argument, it is true that agents had no reason to fear *he* would destroy the drugs after he was arrested. But, as discussed, they could take steps to secure the evidence in the residence, including checking for third persons who might destroy it. That is precisely what Agent Navarro-Perez did. Though Cotto-Cruz argues all persons in the house were immediately arrested and taken outside, Dkt. 39 at 9, Agent Navarro-Perez testified that agents found the house's second occupant, Sonia Aviles-Colón, while performing their sweep. *Navarro-Perez Test.* May 25, 2023. Accordingly, this argument does not warrant suppression.

I note that Cotto-Cruz argues the presence of a K-9 shows that agents intended to search the Orocovis residence before they ever developed a reasonable suspicion for doing so. Dkt. 54 at 12. The First Circuit has previously found such arguments "plainly without merit." *Hernandez-Mieses*, 931 F.3d at 140 (explaining that an "officer's subjective motive, even if improper, cannot sour an objectively reasonable search"). Thus, this argument does not warrant suppression. Accordingly, I recommend finding the agents had a sufficient basis to perform "a very quick and limited pass through the premises to check for third persons who may destroy evidence." *Palumbo*, 742 F.2d at 659.

### C. Plain view

During such a sweep, the agents could quickly look in spaces large enough to conceal a person. *See United States v. Gerry*, 845 F.2d, 34, 37 (1st Cir. 1988); *Palumbo*, 742 F.2d at 659. While conducting such a lawful sweep, agents could also seize any evidence in plain view. *King*, 563 U.S. at 462–63 (citing *Horton*, 496 U.S. at 136–140). Though the First Circuit has articulated at least three tests for applying the plain view doctrine, this court has previously applied the one articulated in in *Hernández-Mieses*, 931 F.3d at 140. *See United States v. Keleher*, 516 F. Supp. 3d 162, 167–68 (D.P.R. 2021) (discussing tests and applying standard articulated in *Hernández-*

*Mieses*). That test "permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." *Hernández-Mieses*, 931 F.3d at 140 (1st Cir. 2019) (internal quotation marks omitted). Accordingly, I examine the evidence at issue under this inquiry.

As discussed, only Agent Navarro-Perez and his fellow SWAT team officers could have conducted a valid sweep of the premises because Agent Ruiz-Bonnet conducted his sweep after agents from the SWAT team already viewed the premises and gave the "clear" signal, *Ruiz-Bonnet Test.* May 25, 2023, and Sergeant Rivera-Rivera did not enter until SWAT officers stated that they had secured the premises. *Rivera-Rivera Test.* June 6, 2023. Agent Navarro-Perez's sweep began immediately after Cotto-Cruz was found and lasted a matter of minutes. *Navarro-Perez Test.* May 25, 2023. For example, he looked in the bathroom for one second. *Id.* He testified he only looked in areas where people could be found. *Id.* Accordingly, he was lawfully present and each room of the residence and could seize any items that were clearly visible if he had probable cause.

I note that PRPB Sergeant Rivera-Rivera ultimately seized and photographed the evidence, and only did so after she was told that the residence was secure. *Ruiz-Bonnet Test.* May 25, 2023; *Rivera-Rivera Test.* June 6, 2023. "Generally, courts consider the subsequent re-entry in order to actually collect the evidence to be a continuation of the original entry." *United States v. Hill*, 2011 WL 1486023, at *9 (D. Minn. Mar. 31, 2011), *report and recommendation adopted*, 2011 WL 1483782 (D. Minn. Apr. 19, 2011). Other courts have determined that once the police lawfully enter the premises, the defendant no longer holds a reasonable expectation of privacy within the home to that extent of the initial invasion. *Montanez v. Carvajal*, 889 F.3d 1202, 1212 (11th Cir. 2018); *United States v. Brand*, 556 F.2d 1312, 1317 (5th Cir. 1977); *Steigler v. Anderson,* 496 F.2d

793, 797–98 (3rd Cir. 1974). Furthermore, those courts have limited the second entry to the scope of the initial invasion. *Montanez*, 889 F.3d at 1212; *Brand*, 556 F.2d at 1317 n. 9. Thus, under either rationale, Sergeant Rivera-Rivera could enter the Orocovis residence if her activities were confined to cataloguing and collecting what Agent Navarro-Perez observed in plain view.

I now turn to the evidence photographed and seized examining whether it was clearly visible and whether Sergeant Rivera-Rivera had probable cause to seize it. I address the evidence in the order in which Sergeant Rivera-Rivera encountered it.

### i.    *The Back Room*

### *Plastic baggies*

Sergeant Rivera-Rivera found several plastic baggies on a shelf in the back room of the residence. *Rivera-Rivera Test.* June 6, 2023; *see also* ex. 53. These items were thus found in plain view. She testified these small bags are used to prepare controlled substances. *Rivera-Rivera Test.* June 9, 2023. The First Circuit has observed that such baggies are "perfect for packaging heroin." *United States v. Polanco*, 634 F.3d 39, 41, 43 (1st Cir. 2011) (affirming denial of suppression motion). Accordingly, Cotto-Cruz's motion to suppress this evidence should be **DENIED**.

### *Bullet*

Sergeant Rivera-Rivera also testified she found a bullet on the shelf in the back room. *Rivera-Rivera Test.* June 6, 2023. This court has previously found that bullets next to Ziploc bags with white powder have an "immediate apparent incriminating character" justifying seizure. *United States v. De Santiago-Acosta*, 2017 WL 2709731, at *8 (D.P.R. June 23, 2017). Though the baggies in the room did not contain powder, controlled substances were visible throughout the Orocovis residence. Thus, Cotto-Cruz's motion to suppress this evidence should be **DENIED**.

### ii.      The Bathroom

Sergeant Rivera-Rivera continued to the bathroom where she encountered a blue cooler on the floor on top of which lay controlled substances, packing papers, and a kitchen knife. *Rivera-Rivera Test.* June 6, 2023; exs. 15–18. She also found packing papers in a bag on the floor next to the trash can and controlled substances in the toilet bowl. *Rivera-Rivera Test.* June 6, 2023; exs. 10, 12, 13. Agent Navarro-Perez also saw these during his sweep. *Navarro-Perez Test.* May 25, 2023. Additionally, Sergeant Rivera-Rivera noted a white plastic bag sticking out of the back of the toilet. *Rivera-Rivera Test.* June 6, 2023; ex. 14.

### Controlled substances and packing paper

Sergeant Rivera-Rivera found these items in plain view. *Rivera-Rivera Test.* June 6, 2023; exs. 14–15. She believed them to be controlled substances and papers used to pack such substances. *Rivera-Rivera Test.* June 6, 2023. Officers may seize items they believe to be controlled substances in plain view. *King*, 563 U.S. at 457, 472. They may also seize packing papers found near such substances that they believe are connected to drug trafficking. *United States v. Ciampa*, 793 F.2d 19, 22 (1st Cir. 1986) (affirming denial of suppression challenged on other grounds). Accordingly, I recommend Cotto-Cruz's motion to suppress these items be **DENIED**.

### Kitchen knife

Like the controlled substances and packing paper, Sergeant Rivera-Rivera found the knife in plain view. *Rivera-Rivera Test.* June 6, 2023. Though it was found next to controlled substances and packing papers, she never explained its relation to drug trafficking. Though the knife's location indicates it may have been used for that purpose, I decline to make such an assumption given the many legitimate uses for a kitchen knife. Without further explanation, this knife is indistinguishable from those shown next to drug paraphernalia on the kitchen counter. *See* ex. 48.

In neither case is the evidentiary value of these items "immediately apparent." Though I note Agent Navarro-Perez's testimony that agents searched areas of danger to protect themselves from physical injury due to a gun or knife, I explained above that preventing the destruction of evidence was the only constitutionally valid basis for his sweep. And the knife posed no danger to officers once they verified no one remained in the bathroom. Accordingly, Cotto-Cruz's motion to suppress the knife is **GRANTED**.

### *Bag of Currency in toilet*

Agent Rivera-Rivera found a white bag sticking out of the tank behind the toilet. *Rivera-Rivera Test.* June 6, 2023; exs. 10, 14, 19. Though money can be seen through the bag after the lid of the tank was fully removed, ex. 20, it is not clear from the photos that it could be seen before that time. *See* exs. 10, 14, 19. No agent testified that it was. By removing the toilet lid and opening the bag, exs. 20, 21, Sergeant Rivera-Rivera "launched [her]self on an exploratory search" and did so "without any prior approval by a detached magistrate." *United States v. Irizarry*, 673 F.2d 554, 559 (1st Cir. 1982) (suppressing gun found after removing ceiling panel above toilet that contained marijuana residue) (citing *United States v. Jackson*, 576 F.2d 749 (9th Cir. 1979) (officer stood in plain view of an open file drawer; his search through the file for evidence was unconstitutional, no matter how strong his suspicion that he would find evidence there)).

Though agents heard flushing while approaching the residence, Agent Navarro-Perez testified it took only one second to view the bathroom and determine no one was inside. *Navarro-Perez Test.* May 25, 2023. As discussed, he was only authorized to sweep the premises for people who might destroy evidence. "[W]here an officer's presence is limited to a particular justification or purpose, what is in plain view is restricted to what could be inadvertently seen when his movements are made pursuant to that purpose." *Irizarry*, 673 F.2d at 559. After that time, "(t)here

was no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant." *Id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). Sergeant Navarro-Perez could not see inside the white bag during his one-second sweep of the bathroom. After he ensured no one remained in the premises there was no threat the contents of the bag would be destroyed in the time needed to obtain a search warrant. Thus, if Sergeant Rivera-Rivera wished to view the contents of the white bag, she needed a warrant. Accordingly, Cotto-Cruz's motion to suppress that evidence should be **GRANTED**.

### iii.    *First Bedroom*

After leaving the bathroom, Sergeant Rivera-Rivera went next to a bedroom that was not the master bedroom. *Rivera-Rivera Test.* June 6, 2023. There, she found various bags that she testified were open. *Id.* These bags contained what she believed were controlled substances as well as containers, packaging, and vials that she recognized as drug paraphernalia. *Id.* exs. 57–96. She also found a pistol magazine in a partially open bag. *Rivera-Rivera Test.* June 6, 2023; exs. 70–71. I turn to the admissibility of this evidence.

#### *Controlled substances and drug paraphernalia*

Sergeant Rivera-Rivera testified the drugs and paraphernalia in exhibits 57 through 68 and 72 through 89 were visible in plain view when she entered the room. *Rivera-Rivera Test.* June 6, 2023. She further testified the plastic bag containing white powder and the accompanying vials were visible when she entered the room. *Rivera-Rivera Test.* June 6, 2023; exs. 90–96. The only evidence to the contrary is Cotto-Cruz's testimony, which I did not find credible for reasons discussed in further detail below. As stated, officers can seize what they believe to be controlled substances and paraphernalia. Accordingly, Cotto-Cruz's motion to suppress this evidence should be **DENIED**.

### Pistol magazine

Sergeant Rivera-Rivera testified she had to move items to enter the room and did not notice the pistol magazine before she did so. I am unclear why Sergeant Rivera-Rivera needed to move items to enter this room when Agent Navarro-Perez testified he and the SWAT team were able to ensure no one was in this room in their initial sweep. *Navarro-Perez Test.* May 25, 2023. Presumably, they needed to enter and exit the room to complete this task and it is unclear how they could have done either if the doorway were obstructed. Nevertheless, Sergeant Rivera-Rivera credibly testified that she needed to move items to enter the room. *Rivera-Rivera Test.* June 6, 2023. There is no reason for her to state she did so if she did not since her movement of items could lead to the exclusion of evidence under the plain view doctrine. The lawful objective of her entry into the residence was to seize evidence that Agent Navarro-Perez and the SWAT team encountered in plain view during their protective sweep. *See Arizona v. Hicks*, 480 U.S. 321, 325 (1987). In doing so, she had to move items to enter a room that was swept and came across this pistol magazine when doing so. Accordingly, this movement did not constitute a search separate and apart from her lawful basis for entering the residence. *Compare id.* (finding movement of stereo to view serial numbers needed to determine if it was stolen was search separate and apart from search for shooter, victims, and weapons that was the lawful basis to enter apartment). Thus, Cotto-Cruz's motion to suppress the pistol magazine should be **DENIED**.

### iv.  *The Master Bedroom*

Sergeant Rivera-Rivera then continued to the master bedroom where she encountered what she described as "a huge mess." *Rivera-Rivera Test.* June 6, 2023; see also exs. 97–123. She noted the butt of a pistol visible in a partially open drawer, broken cell phones on the floor, cell phones on the bed, boxes with bullets, magazines of ammunition, containers of United States currency, a

bag with pills inside, and vials. *Rivera-Rivera Test.* June 6, 2023. With three exceptions, these items are admissible without further discussion because they were found in plain view and their evidentiary value is immediately apparent. *See Hernandez-Mieses*, 931 F.3d at 140 ("The incriminating nature of cash, cell phones, and firearms as common tools of the drug trade is apparent and those items can thus be seized.").

### *The pistol*

Because Sergeant Rivera-Rivera could not see the pistol completely through the partially open drawer, she opened it further. *Id.*; *see* exs. 100–01. Once she realized the incriminating nature of this pistol, she could open the drawer fuller to view it completely. *See United States v. Lemus*, 582 F.3d 958, 965 (9th Cir. 2009) (finding detective who believed butt of weapon was sticking out of couch could lift couch cushion to confirm his belief) (citing *Hicks*, 480 U.S. at 326) ("It would be absurd to say that an object could lawfully be seized and taken from the premises, but could not be moved for closer examination."). Accordingly, Cotto-Cruz's motion to suppress the pistol should be **DENIED**.

### *Box containing currency*

Sergeant Rivera-Rivera spotted a closed black and gray box with a $20 bill sticking out. Ex. 113. When she opened it, she saw several stacks of United States currency held together with rubber bands. *Rivera-Rivera Test.* June 6, 2023; ex. 114. "As a general matter, when police have plain view of a container that, on probable cause, they believe to contain contraband or evidence, they may seize it." *United States v. Arroyo-Medina*, 2015 WL 13729917, at *8 (D.P.R. May 5, 2015), *report and recommendation adopted*, 2016 WL 165006 (D.P.R. Jan. 14, 2016) (citing *Hicks*, 480 U.S. at 326–27). They may not, however, search the container without first obtaining judicial authorization. *Texas v. Brown*, 460 U.S. 730, 747 (Stevens, J., concurring) ("[A] closed

container may not be opened without a warrant, even when the container is in plain view and the officer has probable cause to believe contraband is concealed within.") (further citations omitted). The question then becomes whether the container at issue here was in fact closed, given that a $20 bill was sticking out.

In *United States v. Jacobsen*, 466 U.S. 109 (1984), the Supreme Court held that where agents lawfully came into possession of a package that was leaking a white powdery substance, and "it was apparent that the [package] contained contraband and little else," agents could seize the package and its contents and conduct a field test to confirm the existence of contraband. *Id.* at 121–22. The Court there analogized the field test to a "canine sniff" for controlled substances, which it observed "does not require opening of the luggage" and "does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage." *Id.* (quoting *United States v. Place*, 462 U.S. 696, 707 (1983)).

By contrast, Sergeant Rivera-Rivera's actions here are analogous to rummaging through the contents of luggage. While Sergeant Rivera-Rivera could be quite confident she would find United States currency in this container, she had no way of knowing that is all she would find in a box located in the master bedroom of Cotto-Cruz's residence. A box found in such a private location could certainly contain noncontraband items that would otherwise remain hidden from public view. The contents of this container were even less likely to be exposed than the suitcase at issue in *Place* which the defendant there was carrying through airports in Miami and New York City. 462 U.S. at 698–99. Thus, though Sergeant Rivera-Rivera could lawfully seize this container, she could not open it without a warrant. Accordingly, aside from the $20 bill that could be seen

*United States of America v. Carlos Manuel Cotto-Cruz*, Criminal No. 21-320 (ADC/BJM)          42

without opening the container, Cotto-Cruz's motion to suppress the contents of the container should be **GRANTED**.

### Bullets in Johnnie Walker Box

Photos show a closed black box on top of another box containing ammunition. Ex. 119. The black box is covered with Johnnie Walker Black Label branding. Ex. 123. When moving this box to seize the ammunition below, Sergeant Rivera-Rivera heard pieces moving inside that she believed were also ammunition. *Rivera-Rivera Test.* June 6, 2023. She then opened the black box and found ammunition inside. *Id.* ex. 122.

This court has long recognized that "the [plain view] doctrine has been expanded to cover that evidence that can be perceived by the sense of smell or what the officer may hear." *United States v. Pagan*, 395 F. Supp. 1052, 1061 (D.P.R. 1975), *aff'd sub nom. United States v. Cruz Pagan*, 537 F.2d 554 (1st Cir. 1976). And, in a strikingly similar situation, it addressed whether a Puerto Rico police agent could open a fanny pack after hearing what he believed to be bullets rattling inside. *Arroyo-Medina*, 2015 WL 13729917, at *9. There, it found "even if [the agent] had a legal justification for manipulating the fannypack—and thus for hearing the sound he believed to be bullets—at best, that fact would have given him probable cause to seize the fannypack. In no case could he have searched it." *Id.* (citing *United States v. Jimenez*, 419 F.3d 34, 40 (1st Cir. 2005)). Accordingly, Cotto-Cruz's motion to suppress the contents of the Johnnie Walker box should be **GRANTED**. His motion to suppress the remainder of the items found in the master bedroom should be **DENIED**.

###### v.       *The Living Room*

#### *Pails containing marijuana, powder in baking tray, brown bag, and Ziploc bag in box*

These items were found in the living room where Cotto-Cruz was arrested. Ex. 22, 23, 26, 28, 31, 38, 39, 46. Agent Ruiz-Bonnet, Muriel-Cintrón, and Sergeant Rivera-Rivera testified they could see inside the pails because there were no lids. *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintrón Test.* May 25, 2023; *Rivera-Rivera Test.* June 6, 2023. The government's photos support this assertion. Exs. 22, 23. The other items are visible in photos. Exs. 26, 28, 31, 38, 39, 46. Thus, this evidence was in plain view. All three police officers stated that, based on their experience, they believed what they saw in the pails to be marijuana. Agent Ruiz-Bonnet testified he believed the powder in the tray was a controlled substance. *Ruiz-Bonnet Test.* May 25, 2023. Sergeant Rivera-Rivera testified that she believed the powder in the brown bag and Ziploc bag in the box to be controlled substances or a substance used to prepare them, such as lactose. *Rivera-Rivera Test.* June 9, 2023. As discussed, officers may seize marijuana and powder they believe to be controlled substances in plain view. *King*, 563 U.S. at 457, 472. Accordingly, I recommend Cotto-Cruz's motion to suppress the marijuana, tray of powder, and brown bag containing powder be **DENIED**.

#### *Substances found in three mixing bowls*

I next turn to red, light blue, and dark blue mixing bowls found in the living room. Exs. 38–43. These also contained what Sergeant Rivera-Rivera believed to be controlled substances in rock and powder form. *Rivera-Rivera Test.* June 9, 2023. However, only the contents inside the red bowl were found in plain view. *See* ex. 38. And it is clear from the photos presented at the suppression hearing that Sergeant Rivera-Rivera, or someone else, lifted the box covering the light blue and dark blue mixing bowls to see inside them. *Compare* ex. 38 *with* ex. 39. Accordingly, I

recommend Cotto-Cruz's motion to suppress the contents in the red bowl be **DENIED.** However, his motion to suppress the contents of the light and dark blue mixing bowls should be **GRANTED**.

### Items in black bucket

Likewise, the plastic bags found in a black bucket in the living room should be suppressed. Agent Rivera-Rivera testified that she removed the lid to see inside the bucket. *Rivera-Rivera Test.* June 9, 2023; *see also* exs. 28, 29. Because the contents of this bucket were not in plain view, I recommend Cotto-Cruz's motion to suppress them be **GRANTED**.

### Money-counting machine, strainer, vacuum sealer, and square pieces of aluminum

These objects were all found in the living room in plain view. See exs. 33–38, 44–45. Possession of a money counting machine constitutes circumstantial evidence that a person works in the drug trade. *United States v. Sepulveda-Hernandez*, 752 F.3d 22, 30 (1st Cir. 2014). Another court in this circuit denied a motion to suppress such a machine where it was found with several hundred pounds of marijuana and substantial amounts of cash. *United States v. Mendonca*, 682 F. Supp. 2d 98, 103, 108 (D. Mass. 2010). A vacuum sealer can be seized when found with a firearm and a backpack containing marijuana residue and approximately $30,000. *United States v. Pardo*, 2019 WL 4723751, at *2, 4 (D. Me. Sept. 26, 2019). A strainer found amongst a scale, plastic baggies, and drugs can also be seized as drug paraphernalia. *United States v. Vicente-Lucas*, 826 F. Supp. 2d 422, 427 (D.P.R. 2011). Accordingly, agents had probable cause to seize these items.

As for the aluminum, Sergeant Rivera-Rivera testified that some of the square pieces of aluminum were already prepared, meaning that heroin was inside. *Rivera-Rivera Test.* June 9, 2023. As discussed, police may seize what they, relying on their knowledge and experience, believe to be controlled substances in plain view. *King*, 563 U.S. at 457, 472. Though Agent Rivera-Rivera only believed some of the aluminum pieces contained heroin, she could seize

similar pieces of aluminum found adjacent to those containing heroin as evidence. *See United States v. Gomez-Vega*, 519 F. Supp. 2d 241, 249, 266 (D.P.R. 2007) (denying motion to suppress, among other things, aluminum wrappers found inside vehicle with heroin). Accordingly, I recommend Cotto-Cruz's motion to suppress these pieces of evidence be **DENIED**.

### vi.     *The Kitchen*

In this room, Sergeant Rivera-Rivera found an orange bucket containing several hundred plastic baggies, ex. 47; boxes of plastic bags, a scale, journals, and several boxes, ex. 48; bags of rubber bands, ex. 49; cigars inside several of the mentioned boxes, exs. 50-51; and writings inside the previously mentioned journals. Exs. 51-52.

#### *Plastic bags*

Sergeant Rivera-Rivera testified the orange bucket was open when she entered and there is no evidence to the contrary. Further, the boxes of plastic bags are labeled as such on their exterior. Ex. 48. Accordingly, these items were clearly visible. Sergeant Rivera-Rivera testified these small bags are used to prepare controlled substances. *Rivera-Rivera Test.* June 9, 2023. Thus, Cotto-Cruz's motion to suppress these pieces of evidence should be **DENIED.**

#### *Scale(s)*

Based on Sergeant Rivera-Rivera's experience, she recognized the scale she found in the kitchen as paraphernalia. *Rivera-Rivera Test.* June 9, 2023; *see* ex. 48. The First Circuit has repeatedly found digital scales and plastic baggies to be drug paraphernalia. *United States v. Fermin*, 771 F.3d 71, 79 (1st Cir. 2014) (citing *United States v. Cortés–Cabán*, 691 F.3d 1, 35–36 & nn. 37, 41 (1st Cir.2012)). I note that Sergeant Rivera-Rivera testified that she moved the scale while taking photos. *Rivera-Rivera Test.* June 9, 2023; *compare* ex. 48 *with* ex. 50. Nevertheless,

she originally found the scale in plain view. *See* ex. 48. Accordingly, Cotto-Cruz's motion to suppress the scale should be **DENIED**.

### Rubber bands

Agent Rivera-Rivera testified she found the bags of rubber bands in plain view. *Rivera-Rivera Test.* June 9, 2023; *see also* ex. 49. In her experience, these were used by drug traffickers to package substances. *Rivera-Rivera Test.* June 9, 2023. Accordingly, Cotto-Cruz's motion to suppress the rubber bands should be **DENIED**.

### Cigars inside boxes and writings inside journals

Photos show the boxes in which the cigars were found and the journals on top of them were all originally closed. *Compare* ex. 48 *with* exs. 50, 51. Agent Rivera-Rivera did not address whether she opened the boxes, but she testified she opened the journals to read them. *Rivera-Rivera Test.* June 9, 2023. Photos support this. Exs. 48, 50–52. Thus, the contents of the boxes containing cigars and the journals were not in plain view. Accordingly, Cotto-Cruz's motion to suppress these items should be **GRANTED**.

### vii.      *Items found by residence owner*

The owner of the Orocovis residence, Daniel Casiano-Rivera, testified that he began to clean the structure after a person he believed to be Cotto-Cruz's wife took personal items from it following Cotto-Cruz's arrest. *Casiano-Rivera Test.* May 25, 2023. While doing so, he found an assault rifle, a magazine of ammunition, plastic baggies, and a bank card. *Casiano-Rivera Test.* May 25, 2023; exs. 2, 3. Upon finding these items, he contacted the FBI. *Casiano-Rivera Test.* May 25, 2023.

As discussed, the entry into the home and arrest of Cotto-Cruz did not violate his Fourth Amendment rights. Casiano-Rivera testified he had previously interacted with Yarimar Aviles-

Colón, but she testified that her sister, Sonia Aviles-Colón, met him. Sonia, as discussed, was arrested along with Cotto-Cruz. Thus, it is unclear who removed the personal items from the property. Whoever it was, they left the gun, baggies, and bank card behind. At that point, it was reasonable for Casiano-Rivera to clean and repair the residence so he could rent it to someone else. *See United States v. Wilson*, 472 F.2d 901, 903 (9th Cir. 1972) (after defendant departed residence leaving door open and rent unpaid, "assumption of control of the premises by the landlord was not only reasonable; the failure to take control would have been unreasonable."). When a landlord has a right to enter a premises, and gives law enforcement agents consent to do so, agents' viewing of contraband inside is not illegal. *Abel v. United States*, 362 U.S. 217, 241 (1960). If the property was abandoned, it can be seized. *Id.* (items discarded in hotel room trash can were abandoned because guest removed baggage, returned key, and checked out of room). The *Abel* court held a defendant lawfully arrested in a hotel room where he was residing, and thus forced to leave that room and return key to hotel, could not object to a subsequent warrantless search of the premises immediately after his arrest because the hotel management had the exclusive right to possess the property and gave its consent. 362 U.S. at 241.

I note that Cotto-Cruz did not have much of a choice in leaving the Orocovis residence. However, the same was true for the defendant arrested in *Abel*. There, the defendant was allowed to choose which items to leave behind. 362 U.S. at 241. While Cotto-Cruz did not have that chance, someone, though it is unclear who, cleaned out the Orocovis residence and returned possession to Casiano-Rivera. At that point, Casiano-Rivera could clean and repair the residence so he could rent it to someone else. *See Wilson*, 472 F.2d at 903. Thus, as in *Wilson*:

> The landlord had a right to enter the rental unit. When he saw explosives, he had the right to call the police. *Barnes v. United States*, 373 F.2d 517 (5th Cir. 1967). There was no unlawful invasion of the premises prior to the discovery of the

contraband, and the seizure of the contraband after its discovery required no warrant. *United States v. Tripp*, 468 F.2d 569 (9th Cir. 1972).

*Id.* Accordingly, Cotto-Cruz's motion to suppress the rifle, plastic baggies, and bank card should be **DENIED**.

### IV. Cotto-Cruz's testimony

I note Cotto-Cruz's testimony that the apartment was not in the state depicted by the government's photographs when he was arrested. *Cotto-Cruz Test.* June 9, 2023. He contends nearly all incriminating items were inside suitcases on top of the bed in the room toward the front of the house on the left. *Id.* He claims the toilet lid was closed, there were no substances inside, and there was nothing on the cooler in the bathroom. *Id.* He stated the box shown in exhibit 94 and the orange bucket containing plastic baggies were on top of beds and closed, not on the floor and opened as they were photographed. *Cotto-Cruz Test.* June 9, 2023; *See* def. ex. C. He stated the money counting machine was in a dresser drawer and all the drawers were closed. *Cotto-Cruz Test.* June 9, 2023. He said the red, light blue, and dark blue mixing bowls were also in closed drawers. *Id.* He said the notebooks, scale, and ammunition were inside bags. *Id.* He explained that the woman with whom he shared the house did not know there were illegal items in the house and he did not want his children to come across such items when they visited. *Id.* He further explained that he kept items packed in bags because he was on the run and feared he would need to quickly vacate the premises. *Id.*

I find much of Cotto-Cruz's testimony was not credible. Both Agents Ruiz-Bonnet and Muriel-Cintrón heard other agents yell that they heard flushing while approaching the residence. *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintrón Test.* May 25, 2023. Agent Navarro-Perez testified the bathroom was how it was shown in exhibits 10 through 13 when he did his sweep. *Navarro-Perez Test.* May 25, 2023. Agents Ruiz-Bonnet and Muriel-Cintrón testified they saw the

green pails and marijuana upon entering the residence. *Ruiz-Bonnet Test.* May 25, 2023; *Muriel-Cintrón Test.* May 25, 2023. Agent Ruiz-Bonnet testified that he saw the tray containing white powder on the living room floor. *Ruiz-Bonnet Test.* May 25, 2023. While the officers' immediate observations in the living room and bathroom do not account for all the items photographed, given the evidence contradicting Cotto-Cruz's testimony regarding these items, I have little reason to believe the rest of his statements. Accordingly, they does not alter my analysis of which items should be suppressed.

### V. Cotto-Cruz's Statements to Police

Cotto-Cruz also seeks to suppress statements he made to police following his arrest as fruits of Fourth Amendment violations. Dkt. 39 at 11. He offered no information about when he made such statements, the circumstances in which he did so, or the content of those statements. Nevertheless, having found the entry into the Orocovis residence and Cotto-Cruz's subsequent arrest both complied with the Fourth Amendment, I see no way he can prevail on this argument.

Several factors guide the Supreme Court's determination of "whether the taint of an unlawful search or arrest has sufficiently dissipated so as to no longer taint a subsequently acquired statement." *United States v. Patino*, 862 F.2d 128, 132 (7th Cir. 1988) (citing *Brown v. Illinois*, 422 U.S. 590, 603–049 (1975)). The voluntariness of the statement under the Fifth Amendment is a "threshold requirement." *Brown*, 422 U.S. at 604. A statement must be "sufficiently an act of free will to purge the primary taint" of the Fourth Amendment violation. *Id.* at 602 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). Courts also examine the "'temporal proximity' of the illegal conduct and the confession, the presence of any intervening circumstances, 'and, particularly, the purpose and flagrancy of the official misconduct.'" *Patino*, 862 F.2d at 132 (quoting *Brown*, 422 U.S. at 603–04).Given the complete absence of detail regarding the timing,

*United States of America v. Carlos Manuel Cotto-Cruz*, Criminal No. 21-320 (ADC/BJM)          50

context, and content of Cotto-Cruz's statements, I have no way to conduct this analysis. Cotto-Cruz presented no evidence or argument regarding the voluntariness of his statements, their temporal proximity to the illegal conduct, or intervening circumstances.

Cotto-Cruz's argument lacks another crucial piece of information. Though I found some of Sergeant Rivera-Rivera's actions following the arrest violated the Fourth Amendment, Cotto-Cruz testified he was brought to the front of a neighbor's house within five to ten minutes of his arrest and "did not know anything" until he was brought to a police station around 3:00 or 4:00 p.m. *Cotto-Cruz Test.* June 9, 2023. Accordingly, he never established when he learned of Sergeant Rivera-Rivera's activities. "To succeed on a motion to suppress, a defendant must establish a nexus between the Fourth Amendment violation and the evidence that he seeks to suppress." *United States v. Kornegay*, 410 F.3d 89, 93–94 (1st Cir. 2005); *see also United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) ("At a minimum, a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct.") (citing *Wong Sun*, 371 U.S. at 488). Cotto-Cruz offered no evidence connecting Sergeant Rivera-Rivera's activities with his statements. Accordingly, his motion to suppress his statements should be **DENIED**.

## CONCLUSION

For the foregoing reasons, I recommend Cotto-Cruz's motion to suppress photos taken, evidence seized, and his statements to police be **GRANTED IN PART** and **DENIED IN PART**.

Regarding the knife found in the bathroom, bag of United States currency found in the toilet tank, currency found upon opening the black and gray box, bullets found in the Johnnie Walker Black Label box, powders found in the light and dark blue mixing bowls, plastic bags found in the black bucket, contents of the cigar boxes, and writings inside the journals, Cotto-Cruz's motion to suppress should be **GRANTED**.

*United States of America v. Carlos Manuel Cotto-Cruz*, Criminal No. 21-320 (ADC/BJM)          51

Regarding all remaining items and his statements, Cotto-Cruz's motion to suppress should be **DENIED**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 29th day of June, 2023.


*s/ Bruce J. McGiverin*
Bruce J. McGiverin
United States Magistrate Judge