## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA**

**v.**

**CARLOS COTTO-CRUZ, et al.,**

**Defendants,**

**Crim. No. 21-320 (ADC)**

## OPINION AND ORDER

I.    **Introduction**

Before the Court is a Report and Recommendation ("R&R") issued by Magistrate Judge Bruce J. McGiverin on June 29, 2023, recommending that defendant Carlos Cotto-Cruz's ("defendant") motion to suppress be granted in part and denied in part. **ECF No. 120**. Both defendant and the United States of America ("government") filed objections to the R&R. **ECF Nos. 127** and **128**, respectively.

The objections at issue concern, first, whether a fugitive has a reasonable expectation of privacy in a house where he claims to have resided for months, but which was rented to another person. Second, the reasonableness of the ensuing warrantless search and seizure of several items of contraband—namely, drugs, drug paraphernalia, firearms, and ammunition—is also subject to objection. The government argues that the Magistrate Judge erred in finding that defendant had a legitimate expectation of privacy in the house where he was arrested. Defendant argues that the Magistrate Judge erred in several other respects, starting with the

finding that there was probable cause to enter the residence to arrest him. He also objects to the finding that the police agents observed and validly seized several items that were in plain view as a result of a protective sweep of interior of the residence.

For the reasons explained below, the Court **ADOPTS** the R&R's recommendations, **OVERRULES** the government's objection, **OVERRULES** defendant's objections, and **GRANTS IN PART, DENIES IN PART** defendant's motion to suppress at **ECF No. 39**.

## II.    Relevant Factual Background

The Court summarizes the facts as recited by the Magistrate Judge, supplemented when necessary by the record, and with an emphasis on their relevance to the parties' objections.[1]

At the time of his arrest on May 7, 2021, defendant had an outstanding arrest warrant issued by a Puerto Rico magistrate—in other words, he was a fugitive. Pursuant to that warrant, Puerto Rico Police Bureau ("PRPB") agent Freddy Ruiz-Bonnet ("Agent Ruiz") led the investigation tasked with locating and arresting defendant. On May 6, 2024, his investigation led to a house located in El Gato Ward in Orocovis, Puerto Rico, and more specifically, in the area known as Toro Verde ("Toro Verde Property"). After identifying certain vehicles they knew to be associated with defendant and interviewing neighbors in the area, Agent Ruiz and his

---

[1] The Magistrate Judge held three days of hearings—on May 25 and June 6 and 9, 2023. **ECF Nos. 106, 115, 119**. He heard testimony from Puerto Rico Police Bureau agents Freddy Ruiz-Bonnet and Freddy Muriel-Cintrón, and from sergeants José Fernando Navarro-Pérez and Marie Tere Rivera-Rivera. In addition, he also heard testimony from the owner of the house where defendant was arrested, Daniel Casiano-Rivera, the person who rented it from him, Yarimar Avilés-Colón (who is also the sister of co-defendant Sonia Enid Avilés-Colón), and from defendant himself. The Magistrate Judge received hundreds of pages of exhibits containing the lease contract for the house and photographs of the inside and outside of the house, as well as of the items seized by the police agents. **ECF Nos. 121, 122**.

partner, Agent Freddy Muriel-Cintrón ("Agent Muriel") were able to speak with the owner of the house, Daniel Casiano-Rivera ("Mr. Casiano"). According to the agents, he was able to confirm that defendant was the person who was staying in his property. Agent Ruiz and his team decided to draw up a work plan and proceed to arrest defendant.

In the morning of May 7, the PRPB agents established a perimeter around the house and a SWAT team approached. An unidentified member of the team announced their presence from outside the house but heard no response. Another unidentified team member reported hearing flushing sounds coming from inside the house, which the agents understood meant that evidence was being destroyed. The SWAT team then breached the door. Upon entering the living room, they found defendant in a hallway, hands raised. After securing defendant, Sgt. José Fernando Navarro-Pérez ("Sgt. Navarro"), a member of the SWAT team, proceeded to sweep other rooms in the house in search of other occupants. In the process, Sgt. Navarro observed illegal evidence in plain view. He secured a bathroom and then a bedroom, where he found co-defendant Sonia Enid Avilés-Colón and took her into custody. Sgt. Navarro continued with his protective sweep of the other rooms in the residence and found no one else.

Agents Ruiz and Muriel took custody of both defendants and kept them close to the living room area. Agent Ruiz then walked through the house to ensure that no SWAT officers remained, and after returning to Agent Muriel, who was near the entrance with the defendants, they turned over the scene to Sgt. Mari Tere Rivera-Rivera ("Sgt. Rivera") who was tasked with seizing evidence observed in plain view during the arrest. Approximately one hour after the

arrest, Sgt. Rivera and her K-9 unit entered the house and seized several items as evidence that was purportedly in plain view. Among these were various controlled substances, firearms, ammunition, U.S. currency, and drug paraphernalia.

On September 5, 2021, a grand jury returned seven-count indictment charging defendant with possession with intent to distribute cocaine, crack, fentanyl, heroin, and marihuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (B) and (D), as well as for possession of firearms and a machine gun in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A) and (B)(ii). **ECF No. 1**.[2] On February 25, 2022, defendant filed a motion to suppress the seized items. **ECF No. 39**. Defendant's motion was promptly referred to the Magistrate Judge on March 4 for the setting of a hearing and issuance of a report and recommendation. **ECF No. 40**. The government filed a response in opposition on March 14. **ECF No. 45**. On March 29, defendant filed a reply, **ECF No. 54**, and on April 18, the government a sur-reply, **ECF No. 58**.

After three days of hearing, the Magistrate Judge issued his R&R on June 29, 2023. **ECF No. 120**. There, he recommends that the Court grant the motion to suppress as to several of the items seized from the house, depending on where they were and how they were found. Specifically, the Magistrate Judge recommends that the following items be suppressed:

1. A kitchen knife found in the bathroom.
2. U.S. currency found inside a plastic bag located partially inside a toilet's cistern tank in the bathroom.
3. U.S. currency found inside a black and gray box found in the master bedroom.

---

[2] Co-defendant Sonia Enid Avilés-Colón was also charged in the five drug possession counts. She ultimately pleaded guilty to one count of possession with intent to distribute marihuana. *See* **ECF No. 118**.

4. Several rounds of ammunition found inside a "Johnnie Walker Black Label" box in the master bedroom.
5. Contents (i.e., controlled substances) of the light and dark blue mixing bowls found in the living room.
6. Contents of plastic bags found inside a black bucket in the living room.
7. Content of closed journals found in the kitchen.
8. Contents of cigar box found in the kitchen.

**ECF No. 120** at 50 (summarizing recommendation). On the other, the Magistrate Judge recommends that the Court deny the motion as to the following items:

1. Plastic baggies found on a shelf in the back room of the house.
2. A single bullet found on a shelf in the back room of the house.
3. Controlled substances and packing paper found in the bathroom.
4. Drugs and paraphernalia (packaging materials and containers) in open plastic bags found in the secondary bedroom.
5. Pistol magazine found in the secondary bedroom.
6. Pistol located in partially open drawer found in master bedroom.
7. Several rounds of ammunition found inside boxes in the master bedroom.
8. Pails containing marihuana found in the living room.
9. Controlled substance (powder) in baking tray found in living room.
10. Controlled substance (powder) found in brown bag in living room.
11. Controlled substance (powder) found in Ziplock bag inside a box found in living room.
12. Contents of red mixing bowl found in the living room.
13. Money counting machine, strainer, vacuum sealer, and square aluminum pieces found in living room.
14. Plastic baggies inside orange bucket found in kitchen.
15. Scale found in kitchen.
16. Rubber bands found in kitchen.
17. Plastic baggies, bank card, a rifle, and magazine found by Mr. Casiano in the property some time after the arrest and given to the PRPB.

The Magistrate Judge also recommends that the Court deny the motion as to several other items, as well as to some purported statements made by defendant after his arrest but for which no evidence was presented. *Id.*, at 49-50.

In reaching these conclusions, the Magistrate Judge found, among other things, that (1) defendant had a legitimate expectation of privacy in the house akin to that of an overnight guest under *Minnesota v. Olson*, 495 U.S. 91 (1990) (**ECF No. 120** at 10-16); (2) that the PRPB agents had probable cause to believe defendant was at the Toro Verde Property at the time they entered; (3) that the PRPB agents were entitled to search the areas immediately adjoining the place of the arrest—the living room, kitchen, and entryway—but no basis to perform a protective sweep of the entire house (**ECF No. 120** at 22-29); (4) that the PRPB agents, however, did have a basis to perform a quick sweep of the residence to ensure that evidence was not being destroyed (**ECF No. 120** at 29-33); and (5) that those items that were in plain view during said sweep were lawfully seized (**ECF No. 120** at 33-48).

On July 13, 2024, defendant filed his objections to the R&R. **ECF No. 127**. Defendant lodged three specific objections. First, he objects to the finding that the PRPB agents had probable cause to believe he was at the residence at the time of the arrest. *Id.*, at 2-7. Second, he objects to the Magistrate Judge's basis for finding that Sgt. Navarro could sweep the residence to prevent the destruction of evidence. *Id.*, at 7-12. Within this objection, defendant notes that Sgt. Rivera's subsequent search was the third re-entry performed that day, and that it exceeded Sgt. Navarro's "quick sweep," suggesting that any seizure of evidence by Sgt. Rivera should have been limited to what Sgt. Navarro observed in plain view. *Id.*, at 9-10. Third and last, defendant objects to the finding that his testimony warranted little credibility, presumably in relation to the disorganized state of the house at the time of his arrest. *Id.*, at 12.

For its part, the government filed its own objections to the R&R on September 27, 2024. **ECF No. 128**. The government's objections focus on whether defendant had a legitimate expectation of privacy in the house, without which his motion to suppress the seized items fails. *Id.*, at 5-8. The government also objects to the Magistrate Judge's conclusion that the PRPB agents had no basis to perform a protective sweep of the entire house. *Id.*, at 8-10. Defendant filed a response to the government's objections, supporting the Magistrate Judge's finding that he had a reasonable expectation of privacy in the house, and arguing that the PRPB agents had no articulable basis to believe that other individuals were present and posed a danger to them. **ECF No. 138**.

### III.    Standard of Review

United States Magistrate Judges are granted authority to make recommendations on pretrial matters dispositive of a charge or defense, while the ultimate resolution of motions such as motions to suppress evidence remains at the discretion of the presiding judge. *See* 28 U.S.C. § 636(b); Fed. R. Crim. P. 59(a) and (b)(1). Any party adversely affected by the recommendation issued may file written objections within fourteen days of being served with the report and recommendation. Fed. R. Crim. P. 59(b)(2). A party that files a timely objection is entitled to a *de novo* review of the Magistrate Judge's recommendations. Fed. R. Crim. P. 59(b)(3). Failure to object waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

"The district court need not consider frivolous, conclusive, or general objections." *Rivera–García v. United States,* Civ. No. 06–1004 (PG), 2008 WL 3287236, at *1 (D.P.R. Aug. 7, 2008) (citing

*Battle v. U.S. Parole Comm'n,* 834 F.2d 419 (5th Cir. 1987)). To the extent a party's objections are

little more than general or conclusory, without specifying to which issues the party is objecting,

or where the objections are repetitive of the arguments already made to the magistrate-judge, a

*de novo* review may be unwarranted. *Rivera–García,* 2008 WL 3287236, at *1. "Instead, the report

and recommendation is reviewed by the district judge for clear error." *Id.* (citing *Camardo v. Gen.

Motors Hourly–Rate Employees Pension Plan,* 806 F. Supp. 380, 382 (W.D.N.Y. 1992) ("It is improper

for an objecting party to ... submit[ ] papers to a district court which are nothing more than a

rehashing of the same arguments and positions taken in the original papers submitted to the

Magistrate Judge. Clearly, parties are not to be afforded a 'second bite at the apple' when they

file objections to a R & R.")); *see also Pabón-Mandrell v. United States*, 91 F. Supp. 3d 198, 201

(D.P.R. 2015) (*de novo* review unwarranted where objections are repetitive of the arguments

already raised before the magistrate judge).

        In conducting its review, the Court is free to "accept, reject, or modify, in whole or in

part, the findings or recommendations made by the magistrate-judge." 28 U.S.C. § 636(b)(1); *see

also* Fed. R. Crim. P. 59(b)(3); *Templeman v. Chris Craft Corp.,* 770 F.2d 245, 247 (1st Cir. 1985);

*Alamo Rodríguez v. Pfizer Pharma., Inc.,* 286 F. Supp. 2d 144, 146 (D.P.R. 2003). The court may

accept those parts of the report and recommendation to which the party does not object. *See

Hernández–Mejías v. General Elec.,* 428 F. Supp. 2d 4, 6 (D.P.R. 2005) (citing *Lacedra v. Donald W.

Wyatt Detention Facility,* 334 F. Supp. 2d 114, 125–26 (D.R.I. 2004)). The Court, however, "is not

required to make separate findings of fact or issue an opinion setting forth its own reasoning."

*United States v. Bach*, 388 F. App'x 2 (1st Cir. 2010) (citing *Jonco, LLC v. ALI, Inc.*, 157 F.3d 33, 35 (1st Cir. 1998).

**IV.    Discussion**

The Court will first tackle the government's objection regarding whether defendant possessed a legitimate expectation of privacy in the Toro Verde Property. If so, the Court may then move to consider the government's protective sweep argument as wells as defendant's objections.

**A.    Whether defendant had a reasonable expectation of privacy.**

The question posed is best answered with reference to the Supreme Court's seminal decision in *Minnesota v. Olson*, 495 U.S. 91 (1990). There, the Court held that the Fourth Amendment protects a person from unreasonable searches and seizures even when he is just an overnight guest in an apartment that is not his. In *Olson*, the eponymous defendant was a suspect in an armed bank robbery and shooting. He was wanted pursuant to an arrest warrant, and after the police located him in a duplex apartment, they waited until they got reliable information that he was present in the premises. The police had not sought or obtained a search warrant before entering the apartment, which belonged to a third person who had consented to him staying there. The Supreme Court concluded that although Olson did not reside in the apartment, he still possessed a legitimate expectation of privacy in the premises as an "overnight guest." The Supreme Court waxed eloquently on the reasons for its decision:

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share.

Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.

From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. Society expects at least as much privacy in these places as in a telephone booth—"a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable," *Katz,* 389 U.S., at 361, 88 S. Ct., at 517 (Harlan, J., concurring).

*Id.,* at 98-99.

*Olson* thus provides a marker from which to gauge whether the facts surrounding defendant's arrest afford him the same constitutional protections as an overnight guest would have. In other words, *Olson* provides a minimum from which to measure defendant's legitimate expectation of privacy. Like in *Olson*, defendant was a fugitive, had an arrest warrant issued against him, was wanted for his role in a violent crime, and was arrested by police while he was staying in a house that was not his. Unlike in *Olson*, defendant did not have the direct consent of the property owner, nor of the lessee, to stay in the house. He had the consent of the lessee's sister, who in turn had the consent of the lessee. As far as the Court can see, that is the only point

of divergence between the relevant facts of *Olson* and those of this case in relation to the question at hand.

The government's position, insofar as it relies on defendant not having a "legitimate" property right over the house, is misplaced. While the Fourth Amendment undoubtedly protects a person's right to be secure from unwarranted government intrusion in his property, it also, in addition, protects a person's right to privacy as recognized by society, independent of legal title or right over the premises where he finds himself in. *See Florida v. Jardines*, 569 U.S. 1 (2013); *United States v. Jones*, 565 U.S. 400 (2012); *Katz v. United States*, 389 U.S. 347 (1967). In *Rakas v. Illinois*, 439 U.S. 128 (1978), the Supreme Court flatly rejected a Fourth Amendment test based on whether an individual is "legitimately on the premises." 439 U.S. at 141-42. More recently, in *Byrd v. United States*, 584 U.S. 395 (2018), the Supreme Court recognized that "someone in otherwise lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver." 584 U.S. at 398-99. In the Court's view, if the driver in *Byrd* had a reasonable expectation of privacy in a car travelling on public roads, where a person's privacy expectations are considerably less as compared to the home, then someone staying in a house where he is not listed in the rental agreement should be, at least, presumed to have it too.

That is not to say that the government's position does not raise a point worth discussing. The Supreme Court's reasoning for its holding in *Olson* recognizing a societal expectation of privacy to an overnight guest does not squarely fit with defendant's circumstances. Defendant

was a wanted man on the run from law enforcement, using a house he caused a third person to rent in order to hide. In fact, in a related case before this Court, *United States v. Cotto-Cruz*, Crim. No. 22-213 (ADC) (D.P.R.), defendant similarly argued for the suppression of certain evidence found in an apartment in Isla Verde, Puerto Rico, that he claimed, via sworn testimony, was his home. *See Cotto-Cruz*, Crim. No. 22-213 (ADC), ECF No. 1391. He had also "rented" it in the same way as he "rented" the house at issue here—through a third party via the Airbnb short-term rental platform. *See* Magistrate Judge's Report and Recommendation, Crim. No. 21-320 (ADC-HRV), ECF No. 1811 at 13. It is not unreasonable to think that defendant, being on the run, arranged to rent these properties in other people's names to use as safe houses so that he could continue to hide from law enforcement. From this perspective, accepting the notion that a fugitive utilizing this scheme can claim a legitimate expectation of privacy in these safe houses—one that "society is prepared to accept"—may seem, at least on its face, somewhat jarring.[3] But *Olson's* holding controls here, and if the Fourth Amendment protects an overnight guest wanted by the authorities like the defendant in *Olson*, it is difficult to see how it would not protect defendant.

---

[3] The purpose behind this scheme certainly stands far and apart from the motivations that underpin *Olson*. This contrast produces a stark conceptual dichotomy: on the one hand, the Fourth Amendment's protection of the sanctity of the home against unreasonable government intrusion should be wide and generous; but on the other hand, there is no reason for courts to sanction the creation of subtle artifices whose purpose is to evade authorities and shield oneself from criminal prosecution. The Court here will recognize that defendant's specific situation is covered by *Olson*, but, in its view, the question is a close one. The Court harbors doubt as to whether society would be prepared to recognize a "safe house" scheme like the one described as worthy of endowing a person with an objectively reasonable expectation of privacy. *Cf. Byrd v. United States*, 584 U.S. 395, 409-11 (2018) (remanding to lower courts for further analysis on whether "one who intentionally uses a third party to procure a rental car by a fraudulent scheme for the purpose of committing a crime is no better situated than a car thief" for purposes of the Fourth Amendment).

Accordingly, because an overnight guest wanted by the authorities has a reasonable expectation of privacy in the house he is temporarily staying in, then defendant here, as an avowed guest of the lessee's sister, must have it too. Consequently, the government's first objection is **OVERRULED**.

B.    **Whether the search of the house and seizure of evidence were justified.**

Having found that defendant enjoys a Fourth Amendment right to privacy in the Toro Verde Property, the Court proceeds to analyze the parties' objections as to the search and seizure.

1.    **Basis for entering the Toro Verde Property.**

The Court begins with defendant's objection to the Magistrate Judge's conclusion that the PRPB agents had probable cause to enter the Toro Verde Property.[4] Generally, defendant argues that key portions of the PRPB agents' testimonies regarding their belief that defendant resided and was in the house at the time of the arrest are unsubstantiated, self-serving, or contradicted by other evidence. Many of these objections, therefore, center on the Magistrate Judge's determination of the government witnesses' credibility.

Defendant first takes issue with the testimony of the PRPB agents to the effect that they associated with the defendant certain vehicles parked outside the Toro Verde Property. **ECF No.**

---

[4] The Magistrate Judge recognized that the First Circuit has yet to decide whether probable cause or mere reasonable belief governs the analysis in question. *See* **ECF No. 120** at 17. However, because the Magistrate Judge applied the more exacting probable cause standard, and because the government did not object to its application, there is no reason for the Court to visit this matter.

**127** at 2. This, because the Magistrate Judge found that the presence of these vehicles allowed for probable cause to believe that defendant resided there. *See* **ECF No. 120** at 18-19. But during the hearing, both Agent Ruiz and Agent Muriel testified that in the course of their investigation into defendant's whereabouts, they had received information that associated defendant with a light gray BMW vehicle and a black Ford F-150. *See* **ECF No. 120** at 18; *see also* Tr. of Suppression Hr'g, May 25, 2023, **ECF No. 131** at 104:16-25; 112:25 to 113:10; and 131:24 to 132:4; Tr. of Second Day of Suppression Hr'g, June 6, 2023, **ECF No. 132** at 154:19 to 155:1. Agent Ruiz also testified that he had seen a picture of defendant in the latter vehicle two days before the arrest. *See* **ECF No. 120** at 18; *see also* Tr. of Suppression Hr'g, May 25, 2023, **ECF No. 131** at 131:24 to 132:17. Defendant points out that the alleged photograph was not produced at the hearing.

Defendant then takes issue with the PRPB agents' failure to memorialize or take notes on the interviews they testified they conducted with neighbors. **ECF No. 127** at 3. During the hearing, Agent Ruiz testified that an unidentified person he had interviewed told him that defendant had been seen entering the Toro Verde Property. *See* Tr. of Suppression Hr'g, May 25, 2025, **ECF No. 131** at 128:10 to 129:12. But, because he then spotted a drone flying overhead and worried that defendant was surveilling him, he did not have time to memorialize the interview. *Id.*, at 129:13 to 130:6. Agent Muriel also mentioned performing interviews with unspecified individuals "to corroborate whether in fact [defendant] was exactly where we thought he was . . . ." Tr. of Second Day of Suppression Hr'g, June 6, 2023, **ECF No. 132** at 154:6 to 155:1.

Next, defendant complains that, although the PRPB agents saw the BMW vehicle leave and return to the Toro Verde Property, they could not identify defendant as the person getting in or out of the vehicle in order to ascertain defendant's identity and whereabouts. **ECF No. 127** at 3. During his testimony, Agent Ruiz stated that the BMW vehicle associated with defendant left the Toro Verde Property around 1:00AM on the day of the arrest and later returned around 5:00AM. *See* Tr. of Suppression Hr'g, May 25, 2023, **ECF No. 131** at 134:10-16. Nonetheless, he testified that he did not see defendant get in or out of the vehicle on either occasion, but also suggested that he "could see an individual with the physical characteristics" (implying a reference to defendant's physical characteristics). *Id.*, at 135:1-14.

Finally, defendant posits that Mr. Casiano's testimony as to his conversation with Agents Ruiz and Muriel contradicts the version put forth by the two officers. **ECF No. 127** at 3-5. Mr. Casiano was asked by defense counsel, as part of defendant's attempt to establish standing, whether, before the day of the arrest, he had "not [told] any police officer that you identified a fugitive as the person staying in your home, correct?" to which he answered: "No. The night before some agents called me, but I didn't know who was inside the house." *See* Tr. of Suppression Hr'g, May 25, 2023, **ECF No. 131** at 30:20-25. Defense counsel attempted to clarify with a follow-up question: "You did not tell any agent, 'Oh, yeah. That's a person that is a ─ that's the person that's ─ that person is a fugitive and that's the person that I've seen there.' You did not say that to the officer." *Id.*, at 31:1-4. Mr. Casiano responded simply with a "no." *Id.*, at 31:5.

On the other hand, Agent Muriel detailed his conversation with Mr. Casiano, explaining that he and Agent Ruiz interviewed him by phone the night before. Tr. of Second Day of Suppression Hr'g, June 6, 2023, **ECF No. 132** at 170:7-11. He stated in response to a question by defense counsel on whether Mr. Casiano could identify the "gentleman from the residence" that Mr. Casiano could. *Id.,* at 171:2-10. He explained that he could identify defendant as the "person that lived there." *Id.,* at 171:16.

In sum, the record reflects that the PRPB agents had observed vehicles associated with defendant and inquired from the community about defendant's presence, or someone with similar physical characteristics, in the Toro Verde Property. Moreover, the agents had a telephone conversation with Mr. Casiano to verify whether defendant resided in his property, which Mr. Casiano was able to corroborate. All this serves to further establish probable cause for entry to the Toro Verde Property. That defendant's credibility objections attack these findings is ultimately inconsequential given that the Magistrate Judge, in addition to considering all of the above information in his R&R, was able to observe the demeanor of the testifying witnesses. When it comes to witness credibility, deference to the fact finder is appropriate in most cases, and here, the Magistrate Judge found Agents Ruiz and Muriel to be credible.[5] The Court cannot reject the Magistrate Judge's credibility determinations without

---

[5] As to the apparent discrepancy between Mr. Casiano's testimony and that of Agent Muriel, the Magistrate Judge found that, even removing Mr. Casiano's identification of defendant, there was still enough evidence to sustain a probable cause finding. **ECF No. 120** at 19-20 ("As discussed, Agent Muriel-Cintrón said he interviewed the owner of the [Toro Verde Property] who confirmed that [defendant] was there . . . . However, this identification is not necessary to find probable cause.").

holding a *de novo* hearing of its own—a decision that is ultimately left to its sound discretion. *See United States v. Raddatz*, 447 U.S. 667, 681 n. 7 (1980); *United States v. Hernández-Rodríguez*, 443 F.3d 138, 148 (1st Cir. 2006). After all, "[i]f the Magistrate system is to be effective, and if profligate wasting of judicial resources is to be avoided, the district court should be spared the chore of traversing ground already plowed by the Magistrate" unless the Court finds it necessary to do so. *González-Ramos v. Empresas Berrios, Inc.*, 360 F. Supp. 2d 373, 376 (D.P.R. 2005) (citing *Sackall v. Heckler*, 104 F.R.D. 401, 402-03 (D.R.I. 1984)). But the Court "generally will not disturb the credibility determinations of a magistrate judge." *United States v. López-Ortiz*, 648 F. Supp. 2d 241, 249 (D.P.R. 2009); *see also, United States v. López-Torres*, Crim. No. 17-0582, 2022 WL 3443811, *5 (D.P.R. Aug. 16, 2022). "To require the district court to conduct a second evidentiary hearing whenever either party objects to the magistrate judge's credibility finding would frustrate the plain objective of Congress [in 28 U.S.C. § 636(b)(1)] to alleviate the increasing congestion in district courts." *United States v. Cadieux*, 295 F. Supp. 2d 133, 135 (D. Me. 2004).[6] Here, after a detailed review of the suppression hearing transcripts and exhibits, the Court finds no reason to overturn the Magistrate Judge's determination that the PRPB agents were credible witnesses.

Finally, defendant argues that the Magistrate Judge erred in holding that PRPB agents had at least as much information than the police officers had in *United States v. Jones*, 523 F.3d 31

---

[6] On the other hand, "a district judge need not hear the live testimony of a witness in order to *accept* the credibility determination of a magistrate judge." *Hernández-Rodríguez*, 443 F.3d at 147-48 (citing *Raddatz*, 447 U.S. at 680-81).

(1st Cir. 2008) to find probable cause under *Payton v. New York*, 445 U.S. 573 (1980) to enter a residence in execution of an arrest warrant. *See* **ECF No. 120** at 16-20. That matter was litigated in full before the Magistrate Judge, who found that the PRPB agents had sufficient information at the time they entered the Toro Verde Property to believe that defendant resided in the location and that he would be present at the time they executed the arrest warrant. **ECF No. 120** at 20. Defendant's arguments thus border on rehash, *see Pabón-Mandrell*, 91 F. Supp. 3d at 201 (*de novo* review unwarranted where objections are repetitive of the arguments already raised before the magistrate judge), but even under *de novo* review, the Court sees no justification, given the evidence, to disagree with his conclusion. Defendant's objections in this regard are therefore **OVERRULLED**.

      **2.**      **Protective sweep to ensure the agents' safety and preserve evidence found in plain view.**

The Court moves now to the parties' objections as to the scope of the search conducted by the PRPB agents at the scene. Here, the Magistrate Judge analyzed three exceptions to the warrant requirement, namely, a protective search of immediately adjoining areas incident to an arrest, a limited protective sweep to search for individuals posing a danger to those in the scene of an arrest, and a limited protective sweep to preserve evidence from being destroyed. The Magistrate Judge found that the PRPB agents' search of the areas immediately adjoining defendant's arrest—that is, the living room, the kitchen, and the house's entryway—was permissible under *Maryland v. Buie*, 494 U.S. 325 (1990). **ECF No. 120** at 21-22. On the other hand, he found that the PRPB agents' warrantless search of the remaining rooms in the house was

unjustified insofar as, at the time, there were no specific and articulable facts known to the PRPB agents for them to believe that someone else was in the house and posed a risk to officer safety. *Id.*, at 22-29. In doing so, the Magistrate Judge rejected several rationales put forth by the government aiming to justify the search of the whole of the house under this exception. In the end, however, the Magistrate Judge found that a search of the house was permissible under a different exception: that the PRPB agents had reasonable basis to believe that evidence was at risk of being destroyed. *Id.*, at 29-33.

The government objects to the Magistrate Judge's rejection of its arguments justifying a protective sweep on officer safety concerns. **ECF No. 128** at 8-10. But its arguments are unavailing. The Magistrate Judge examined, in detail, the facts available to the PRPB agents at the time they entered the Toro Verde property to arrest defendant and measured them against the applicable standard set by *Buie* and applicable First Circuit case law. *See* **ECF No. 120** at (discussing and applying, among others, *United States v. Hernández-Mieses*, 931 F.3d 134 (1st Cir. 2019); *United States v. Serrano-Acevedo*, 892 F.3d 454 (1st Cir. 2018); *United States v. Delgado-Pérez*, 867 F.3d 244 (1st Cir. 2017); and *United States v. Paradis*, 351 F.3d 21 (1st Cir. 2003)). The government does not offer a developed argument as to why the Magistrate Judge's reasoned conclusion is wrong. Such general and conclusive objections are normally insufficient to warrant consideration. *See Rivera–García*, 2008 WL 3287236, at *1 ("The district court need not consider frivolous, conclusive, or general objections."). In any case, in light of the ultimate result, the Court sees no reason at law or fact to depart from the Magistrate Judge's conclusion that, under

the facts and circumstances, concerns for officer safety were insufficient to merit a warrantless search of the whole of the Toro Verde Property.

On the other hand, defendant objects to the Magistrate Judge's finding that the sound of a toilet flushing represents an exigent circumstance that merits a protective sweep of the house to prevent the destruction of evidence. **ECF No. 127** at 8. In support, he points to his own testimony denying the fact and to the impossibility of flushing several kilograms of solid cocaine. *Id.* But the Magistrate Judge ably disposed of these arguments. As to defendant's own testimony denying that any flushing occurred, the Magistrate Judge afforded it little credibility when weighed against the testimony of Agent Ruiz and Agent Muriel. *See* **ECF No. 120** at 48. The testimony on record, and as reflected by the Magistrate Judge in his R&R, shows that Sgt. Navarro observed powder residue on the bathroom countertop and sink, as well as white crystalline rocks at the bottom of the toilet bowl. *Id.*, at 6. This is consistent with attempted or actual destruction of evidence.

As to the alleged impossibility of disposing of all the contraband, the Magistrate Judge reasoned:

> [Defendant] cites no authority that the exigent circumstances inquiry requires the government to establish that agents feared all, as opposed to some, evidence may be destroyed. . . Agents posted outside the [Toro Verde Property] had no way of knowing whether people inside could completely dispose of their controlled substances or not. And even once they saw controlled substances in the living room, they could not know how much, if any, remained in other rooms of the house. . . . Accordingly, [defendant's] argument fails. . . .

*See* **ECF No. 120** at 32. The Court agrees in full, and adds that other evidence, such as ammunition, could have also been flushed, rendering defendant's theory inapplicable as to evidence other than controlled substances.

Moving to defendant's objection to the extent of the search, these are based on the interplay between the protective sweep performed by Sgt. Navarro and the subsequent collection of evidence in plain view performed by Sgt. Rivera.[7] Defendant argues that Sgt. Navarro's protective sweep uncovered no evidence in plain view save for a white powder in the bathroom adjoining the living room, and that he did not tell his fellow agents about it. **ECF No. 127** at 9. Defendant further maintains (without citation to authority) that "[a]n agent cannot claim to seize something on plain view based on the actions of another agent when the initial agent did not see evidence on plain view," alluding to Sgt. Rivera's subsequent search of the rooms Sgt. Navarro searched. *Id.*

The Magistrate Judge analyzed the legal basis for Sgt. Rivera's search in detail. Relying on the plain view doctrine and the lawfulness of Sgt. Navarro's protective sweep to preserve evidence, the Magistrate Judge then held that Sgt. Rivera was legally entitled to be in the rooms Sgt. Navarro searched and to seize any contraband in plain view. The Magistrate Judge relied on *Montanez v. Carvajal*, 889 F.3d 1202 (11th Cir. 2018) and the cases cited therein to hold that "once the police lawfully enter the premises, the defendant no longer holds a reasonable

---

[7] As defendant points out, the Magistrate Judge ruled a cursory intermediate search by Agent Ruiz impermissible under the officer safety exception. *See* **ECF No. 127** at 10; **ECF No. 120** at 28-29. That ruling is not objected here.

expectation of privacy within the home to the extent of the initial invasion." **ECF No. 120** at 34. While this rule is non-binding, out-of-circuit authority, defendant has not made his case as to why it should not apply here. Besides referring to the general rule that the government must usually obtain a search warrant, he cites no authority, binding or otherwise, to counter the common-sense rule of *Carvajal* that the police may re-enter a property that was legally entered under exigent circumstances to the same extent as that initial entry.

Of course, this rule cannot be read to allow multiple unrestricted re-entries to a defendant's home far and apart from the initial intrusion. But a re-entry done one hour after the protective sweep to catalogue and seize evidence in plain view, as was the case here, does not run afoul of the Fourth Amendment, whose touchstone is, first and always, reasonableness.

For these reasons, both the government and defendant's respective objections to the basis for the search performed in the Toro Verde Property are **OVERRULED**.

### C.      Whether defendant was a credible witness.

Finally, defendant lodges an objection to the Magistrate Judge's determination that his testimony at the suppression hearing was not credible. **ECF No. 127** at 12. Defendant testified and asserted that all of the evidence was neatly stored or placed within a suitcase (in case he needed to leave the house abruptly) rather than strewn out in plain view. But the law enforcement officers' testimonies and the photographs of the scene establish an entirely different scenario. As pointed out above, the Court will not lightly disturb the Magistrate Judge's credibility determinations. Here, the Magistrate Judge considered the government witnesses to

be more credible than defendant as to various key matters. **ECF No. 120** at 48-49. There is nothing in the record or the parties' submissions that would move this Court to alter the Magistrate Judge's appreciation of the witness' demeanor, conduct, and other relevant aspects of his testimony. And ultimately, the Magistrate Judge found defendant's testimony irrelevant with regards of his "analysis of which items should be suppressed." *Id.*, at 49. In sum, the Court agrees with the Magistrate Judge's finding.

**V.      Conclusion**

The Magistrate Judge's R&R reflects a careful, reasoned exercise in judicial fact-finding and application of law. In the Court's view, the Magistrate Judge ably discharged his duty to separate the wheat from the chaff, taking a complex factual situation and analyzing under the appropriate legal standards. He recommended the suppression of items seized in violation of the plain view doctrine and the denial of the suppression of other evidence found in plain view. Having reviewed the parties' submissions and the testimonies on record, the Court finds that neither party has given it a persuasive reason to double-guess the Magistrate Judge's well-thought-out analysis and conclusions.

For all the foregoing reasons, the Court hereby **ADOPTS** the R&R at **ECF No. 120**, **OVERRULES** both the government and the defendant's respective objections at **ECF Nos. 127** and **128**, and **GRANTS IN PART, DENIES IN PART** petitioner's motion to suppress at **ECF No. 39**.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 4th day of March, 2025.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**